## THE STATE OF CONNECTICUT *against* DE WOLF.

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

A deaf and dumb person, capable of relating facts correctly, by signs, may give evidence by signs, through the medium of an interpreter, though it appear, that such person can read and write, and communicate ideas imperfectly, by writing.

Where on the trial of an indictment for an attempt to commit a rape, after the person injured had testified, and the prisoner had cross-examined her, and on such cross-examination, had asked her many questions relative to the principal fact charged in the indictment, many of which tended to discredit her testimony, but before any attempt to discredit her otherwise than by such cross-examination, the public prosecutor offered a witness to prove that the person injured had previously told to her the same story which she had now testified in court; it was held, that such testimony was admissible, to shew constancy in the declarations of the principal witness, and thus to confirm her testimony.

Where the confirmatory witness, in such case, testified, that the principal witness, who was deaf and dumb, had, more than a year after the commission of the alleged offence, committed to her, in writing, the substance of what she had now testified; and that such confirmatory witness did not know where the writing was; it was held, that there was not sufficient proof of loss to dispense with the production of the writing, and consequently, that evidence of its contents was inadmissible.

Where the person injured and the principal witness, in a prosecution for an attempt to commit a rape, was deaf and dumb, and the public prosecutor offered evidence to prove, that her general character for truth was good; it was held, that such evidence was admissible, though no impeachment of her character had been attempted.

After the prisoner, in such prosecution, had attempted to discredit the testimony of the principal witness, by proving that she had given different accounts of the transaction; and after she had sworn, that she concealed the transaction more than a year, assigning, as a reason for so doing, the threats and influence of the prisoner and her fear of him; the public prosecutor offered to prove, by an instructor of the deaf and dumb, who had been her teacher, that the deaf and dumb generally have a sense of inferiority to other people, and, as a class, are easily intimidated; that they are credulous, sincere and submissive; and that from his acquaintance with the witness, he believed such to be her character; it was held, that such evidence was inadmissible, as opening a door for enquiries in their nature interminable, without producing any satisfactory result.

THIS was an indictment against the prisoner, *Thaddeus K. De Wolf,* for an attempt to commit a rape on the body of *Celestia Bull,* on the 15th of *June,* 1828.

The cause was tried at *Litchfield, February* term, 1830, before *Peters,* J.

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

On the trial, *Celestia Bull*, a person deaf and dumb from her infancy, was sworn as a witness, and testified to the principal facts in the case, by signs ; which were interpreted to the court and jury, by *William W. Turner*, a teacher in the *American Asylum* for the education of the deaf and dumb, who was duly sworn for that purpose, and was also sworn as a witness.    Mr. *Turner* testified, that *Celestia* had resided in the *Asylum* about five years, and was well acquainted with the language of signs, and capable of relating facts correctly, in that manner : that she could also read and write, and communicate her ideas imperfectly, by writing.    The prisoner objected to her testifying in this manner, and claimed, that she ought to give her testimony in her own words in writing.    The judge overruled the objection, and admitted her to testify in the manner stated.

After the prisoner had cross-examined *Celestia*, and asked her many questions relative to the principal fact charged in the indictment, some of which tended to discredit her evidence, but before any attempt on his part to discredit her testimony otherwise than by such cross-examination, the state's attorney offered *Polly Rowley*, as a witness, to prove, that *Celestia* had previously told to her the same story, which she had now testified in court.    To this the prisoner objected ; but the judge admitted her testimony ; which proved the fact for which it was offered.

It also appeared from this testimony, that the communication from *Celestia* to the witness, was made *in writing*.    The witness being enquired of where the writing then was, said, that she did not know.    The prisoner again objected to her testimony, on the ground that the writing was not produced, nor proved to be lost ; but the judge still held it to be admissible.

The state's attorney then offered witnesses to prove, that the character of *Celestia* for truth, was fair ; to which the prisoner objected ; but the judge admitted the evidence.

*Celestia* having sworn, that she concealed the outrage committed upon her, for more than a year, and stated, as a reason, the threats and influence of the prisoner, the state's attorney offered to prove, by Mr. *Turner*, that the deaf and dumb generally have a sense of inferiority to other people, and, as a class, are easily intimidated ; that they are credulous, sincere and submissive ; and that from his acquaintance with *Celestia*, he believed such to be her character.    To this testimony the prisoner objected ; but the judge admitted it.

The jury having found the prisoner *guilty*, he moved for a new trial, on the ground of the several decisions of the judge above stated.

*P. Miner* and *T. Smith,* in support of the motion, contended,
1. That the testimony of *Celestia Bull,* the principal witness, was not taken in the proper mode. As she could communicate her ideas, directly, to the court and jury, in the ordinary way, by writing, there was no occasion for resorting to the extraordinary and indirect mode of communication by signs, through the medium of an interpreter. [This point was not much insisted on.]

2. That the testimony of *Polly Rowley,* that *Celestia* had, many months after the commission of the alleged offence, communicated to her, in writing, the substance of what she had sworn to, on the trial, was inadmissible. It certainly did not go to the point of *guilty* or *not guilty.* It was subject to all the infirmities of *hearsay* testimony. It was a statement made out of court ; not under oath ; in the absence of the prisoner ; and without cross-examination.

But it will be claimed, that the evidence of *Polly Rowley* was admissible to *confirm* the testimony of *Celestia,* as given in court. To this we answer, that it was not admissible as part of the *res gesta.* It was made many months after the perpetration of the crime, and had no connexion with it, or with the effects and consequences of it. If admissible as confirmatory evidence, it must be because the nature of the offence makes an exception to the general rule. But in rape, the admissibility of the evidence is subject to the following qualifications. First, the declarations must be connected with the effects and consequences of the injury, or contemporaneous therewith : Or, as the rule is usually expressed, they must be made immediately after, and before it is likely that the party has contrived any thing to her private advantage. 1 *Stark. Ev.* 149. 3 *Stark. Ev.* 1268. 1 *Hale's* P. C. 633. 1 *East's* P. C. 445. *Leach* 237. Secondly, they must not only be contemporaneous with the immediate effects of the injury, but must be limited to the cause of those effects and an explanation thereof. A narration of particulars is not admissible. *Rex* v. *Clarke,* 2 *Stark. Rep.* 241. 243. *The Queen's* case, 2 *Brod. & Bing.* 294. (6 *Serg. & Lowb.* 119.) Such evidence is not admissible even when contradictory statements are pro-

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

ved.  1 *Stark. Ev.* 149. n. (*n*)   At any rate, it is admissible only in reply to proof of contradictory declarations, by the witness : it cannot be received as confirmatory in chief.  1 *Phill. Ev.* 213. and n.   1 *Stark. Ev.* 148.

3. That if a narration of the facts, long after the injury, unconnected with the offence, or the consequences of it, may be received, in this case ; yet as the declarations were in writing, the written statement should have been produced, or its loss proved.   The loss can be proved, only by shewing its accidental destruction, that diligent search has been made at the proper place of enquiry, and that it could not be found.   *Jackson* d. *Dunbar* & al. v. *Todd,* 3 *Johns. Rep.* 300.   But here, there was not even an attempt to prove its loss.   The written statement was indispensable as the better proof.   *Polly Rowley* had no knowledge of the facts, except what she derived from the writing.   Her testimony, *ex natura rei,* involved the existence of evidence of a higher nature.   *Doe* d. *Church* & al. v. *Perkins* & al. 3 *Term Rep.* 749. 753.   1 *Phill. Ev.* 174.   *Mather* & al. v. *Goddard,* 7 *Conn. Rep.* 304.

But if it was proper to call on *Polly Rowley* to testify to the contents of the writing, she should have given the words of it, as near as she could recollect.   The attorney for the state could not prove by her, that the *substance* of the writing corresponded with the testimony of *Celestia,* as given in court.   For, in the first place, the witness might mistake the substance. She had no right to judge of it ; for that involved the construction of the writing, which is a question of law.   Secondly, whether the writing corresponded with the testimony given in court, was a question of fact for the jury, and not for *Polly Rowley,* to decide.

4. That the testimony introduced to prove, that the character of *Celestia* for truth, was fair, was inadmissible ; she being in that particular unimpeached.   In the first place, if the evidence was admissible, the character of every witness can be proved, though unimpeached ; and even the character of each witness called to support that of the principal witness ; and so on *ad infinitum ;* and thus a multitude of issues may be created, by the parties, *ad libitum,* wholly collateral to the main subject of inquiry.   In the next place, such evidence will frequently do great injustice to the opposite party.   It is not *needed,* so far as the party offering it is concerned ; for the law presumes every man's character to be good.   2 *Stark. Ev.* 368.

It will, therefore, only be resorted to, where the credit of the witness is equivocal,—who, perhaps, does not, in fact, stand high in the scale of integrity, but who cannot be impeached. In such case, the party will collect the friends of the witness, and give him a much higher character than he deserves. His real character will seldom be given. The Bishop of *Durham* v. *Beaumont*, 1 *Campb.* 207.

5. That the testimony of Mr. *Turner*, that the deaf and dumb generally have a sense of inferiority, are easily intimidated, credulous, sincere and submissive, and that he believed such to be the character of *Celestia*, was inadmissible. This evidence was objectionable, first, because it went to prove *particular facts* in relation to her character, and not her *reputed* character. *Stow* v. *Converse*, 4 *Conn. Rep.* 40, 41. Secondly, because it was out of the issue, and therefore a surprise on the opposite party. Thirdly, because a part of it was merely an *opinion* or *inference* of the witness from facts not stated to the jury. *Grant* v. *Thompson*, 4 *Conn. Rep.* 203. 208. Fourthly, because the facts were too remote to justify any inference by the jury adverse to the prisoner; for the character of *Celestia* might have been very different from that of the deaf and dumb generally. Fifthly, because such evidence is unprecedented.

*Benedict* and *S. Church*, contra, contended, 1. That an intelligent deaf and dumb person, may give his evidence by signs, through the medium of an interpreter. *Swift's Ev.* 46. *John Ruston's* case, *Leach's Cro. Ca.* 347. (*Dub.* ed.) It appears from the motion, that *Celestia* could relate facts *correctly*, by signs; and it surely does not render this mode of communication improper, that she could convey her ideas *imperfectly*, by writing.

2. That after the prisoner had asked the principal witness, on cross-examination, many questions tending to impeach her testimony, evidence on the part of the prosecution was properly admitted to prove that such witness had previously told the same story to a female acquaintance. 1 *Stark. Ev.* 148. 1 *Phill. Ev.* 213. But aside from any previous impeachment of the witness, on cross-examination or otherwise, in prosecutions for rape, or an attempt to commit a rape, the declarations of the injured party out of court, are always admissible. 1 *East's P. C.* 438. 445. 3 *Stark. Ev.* 1268. 1 *Hale's P. C.* 633.

Vol. VIII.      13

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

It is not necessary, as a matter of law, that the declarations should have been made *immediately* after the offence committed. 1 *Russell on Crimes* 808. 1 *East's P. C.* 438. 445. It is a sufficient guard, that the time when and circumstances under which they were made, are open to observation before the jury.

3. That the testimony of *Polly Rowley*, that *Celestia* had communicated the same facts to her in writing, which writing was not produced, nor did the witness know where it was, was properly received. This writing was not an instrument or document, nor any thing more than the *conversation* of the witness with *Polly Rowley ;* and whether it was addressed to the eye or to the ear, is immaterial. Where a conversation is reduced to writing, by a party to it, or by a by-stander, the paper need not be produced.

But if this is to be considered as on a footing with a written instrument or document, there was sufficient proof of loss. It was not intended to be preserved ; nor was it thought to be of any value ; and the person for whose information it was originally made, and to whom it was originally given, did not know where it was. It was in vain to *search* for such a thing ; for, as it was *functus officio*, and not to be kept, it had no place of deposite. *Jackson* d. *Bond* & al. v. *Root,* 18 *Johns. Rep.* 60. 73, 4. *Jackson* d. *Livingston* & al. v. *Frier*, 16 *Johns. Rep.* 193. 195, 6. *Renner* v. *Bank of Columbia*, 9 *Wheat.* 581.

4. That the testimony offered, by the public prosecutor, to prove, that the character of *Celestia* for truth, was fair, was properly admitted. This was after the prisoner had, on cross-examination, asked the witness many questions tending to impeach her testimony. The credibility of the witness was impeached *afterwards*, by cross-examination and otherwise. It was proper that it should be supported, in some stage of the trial ; and it cannot be material in what stage. 3 *Stark. Ev.* 1757. At any rate, a new trial will not be granted, unless the court can see, that upon the *whole case* injustice has been done.

5. That the testimony of Mr. *Turner* as to the character of the deaf and dumb generally, and particularly of *Celestia*, was properly received. In the first place, this being a matter of science, or professional skill, it was proper for the witness, who was an instructor of that class of persons, to give his *opinion.* Secondly, character, *ex natura rei*, is, in all cases, a matter of opinion. Thirdly, the witness having stated reasons why she

concealed the transaction, the testimony in question was prop-
er to shew that such reasons were the true ones. 1 *Russell on*
*Crimes* 808. 1 *East's P. C.* 438. 445. 1 *Stark. Ev.* 54. 1
*Phill. Ev.* 209.

DAGGETT, J. Several objections were made at the trial, against testimony offered by the public prosecutor, which appear on the motion, and are now urged as reasons for granting a new trial. They will be considered in the order presented by the counsel for the prisoner.

1. The supposed victim of the outrage of the prisoner, was deaf and dumb. She was sworn, and testified by a sworn interpreter, an instructor in the *Asylum* for the deaf and dumb, through certain signs adopted as a medium of communication, by that class of persons. It was objected, by the counsel for the prisoner, that as it appeared by the testimony of the interpreter, that " she could read and write and communicate her ideas imperfectly by writing ;" and it further appeared, that " she understood the language of signs, and was capable of relating facts correctly, in that manner ;" she ought to testify in her own words in writing. The judge very properly overruled the objection. The bare statement of the objection, overthrows it. She was capable of relating facts *correctly*, by signs ; she could read and write, and communicate her ideas *imperfectly*, by writing. The objection, thus viewed, presents this absurdity, that the court erred in resorting to the *most perfect* mode of ascertaining the truth. The mode of examination adopted by the court, was the next best mode to an oral examination, which, for many obvious reasons, is preferable to an examination in writing, but which could not be had in this case, on account of an infirmity in the witness. I see no ground for this objection.

2. After the prisoner had cross-examined *Celestia*, and asked many questions relative to the principal fact charged in the indictment, about which she had testified, many of which tended to discredit her testimony, but before any attempt to discredit her, otherwise than by such cross-examination, the attorney for the state offered *Polly Rowley* to testify, that *Celestia* had communicated to her the same story which she now related ; to which the prisoner objected ; but the objection was overruled. I am aware, that whether testimony can be received confirmatory of what a witness has previously said, be-

*Litchfield,*
June, 1830.

State
*v.*
De Wolf.

fore an impeachment, either general or particular, is a question about which different opinions have been entertained. It is believed, that the decisions on the circuit do not perfectly harmonize on this subject, and it may be proper hereafter to settle it definitively; but as there is not a coincidence of opinion on this point, and as a majority of the Court concur in the opinion that the testimony was properly admitted, a discussion and decision of the general question, is waived. It was properly admitted in this case, because on an indictment for rape, or an attempt to commit a rape, such evidence is received to shew *constancy* in the declarations of the witness. If a female testifies, that such an outrage has been committed on her person, an enquiry is, at once, suggested, why it was not communicated to her female friends. To satisfy such inquiry, it is reasonable that she should be heard in her declarations, that she did so communicate it, and that testimony should be received to confirm her story. The *time* when these communications were made, is proper to be considered, by the triers: it bears on the question of fact.

3. The witness *Polly Rowley* then testified, that in the fall of 1829, *Celestia* communicated to her *in writing* the substance of what she had now testified, and that she did not then know where the writing was. Upon this disclosure of the writing, the prisoner made a further objection, that the writing should be produced, and that she could not testify as to its contents. This objection was overruled, and the testimony was admitted. I am of opinion, that upon this statement of the facts in relation to the writing, the judge should have rejected her testimony. If the paper containing that communication had been lost, the fact could have been proved, and then its production would have been dispensed with; but her declaration was simply, that she did not know where it was. There was no proof that she had made search for it among her papers. Upon this evidence, it can hardly be said, that there was *any* proof of loss so as to let in the secondary evidence.

4. Witnesses were then offered, by the state's attorney, to prove the general character of the witness, *Celestia*, for truth, to be good. Being objected to, on the ground, that no impeachment had been attempted, the proof was admitted. It would not be going too far, perhaps, to say, that the general character of the witness, who is the victim of the outrage, in prosecutions for rape, and attempts to commit a rape, may al-

ways be shewn. Our books tell us, that if the witness, in these *Litchfield,* cases, be of good fame, it greatly strengthens her testimony; June,1830. if of evil fame, it is thereby lessened. But, without deciding —————— that point, let us look, for a moment, at the condition of this State woman. By this condition she may fitly be said to be a stran- *v.* De Wolf. ger even in her own neighbourhood. Unable to hear or speak, she is excluded from society, and can be known only to a few of her relatives and companions in affliction. Had the outrage been sworn to, by a stranger, passing transiently through the state, it would certainly be proper for the attorney to prove the character of the witness. And I think, upon similar prin- ciples, it was proper to support the character of this witness.

5. During the trial, the prisoner attempted to discredit the tes- timony of *Celestia*, by proving, that she had given different accounts of the transaction on oath and in writing. And she having sworn, that she concealed the transaction more than a year, and assigned, as a reason therefor, the threats and influ- ence of the prisoner and her fear of him, the attorney for the state offered to prove, by the interpreter, *Turner*, who was an instructor in the *Asylum*, that the deaf and dumb, generally, have a sense of inferiority to other people, and, as a class, are easily intimidated ; are credulous, sincere and submissive ; and that this was her character. On objection, this testimony was admitted. I am of opinion that this decision was erroneous. It is opening a door for enquiries in their nature interminable ; and, after all, no satisfactory result can be obtained.

On the third and fifth grounds, I am in favour of granting a new trial.

The other Judges were of the same opinion, except that PE- TERS, J. was inclined to think, in relation to the last point, that the evidence was properly received.

New trial to be granted.