The State of Iowa v. Cruise.

THE STATE OF IOWA V. CRUISE.

1. **Criminal law:** EVIDENCE: DECLARATIONS OF PRISONER. When a circumstance in the conduct of the prisoner was alleged to have occurred on the day of the commission of the offense, and its occurrence on that exact day was material as an important fact tending to establish the guilt of the accused, it was held, upon the separate trial of a co-indictee, in which such prisoner was introduced as a witness, that statements made by him *before the alleged offense was committed,* relating the circumstances and showing its occurrence on a prior day, were admissible, either as independent evidence, or as sustaining the evidence of the prisoner.

2. —— ALIBI: CASE APPROVED. The law relating to *alibi* as a defense in a criminal proceeding, as stated by SHAW, Ch. J., in the *Webster-Parkman* case, 3 Cush., approved.

*Appeal from Dubuque District Court.*

MONDAY, OCTOBER 16.

CRIMINAL LAW — DECLARATIONS OF PRISONER WHEN EVIDENCE: ALIBI, &C. — The defendant above named, and one A. M. Conkling, were jointly indicted for larceny. The defendant, Cruise, was tried separately and convicted. From the evidence the following facts, material to the only question decided by the court, appear.

On Tuesday, the 13th day of December, 1864, one Johnson had eleven head of cattle stolen from him, and it was for this theft that defendant and Conkling were indicted. Conkling resided near Johnson, and Cruise had, until a few days before, lived with or near Conkling, in the county, a few miles from Dubuque. During the same night on which the cattle were stolen, two men on horseback driving cattle were met by several persons on the road leading to Dubuque, but the accused were not then identified. About three o'clock on Wednesday morning a watchman at a mill in the suburbs of Dubuque, saw two men on horseback driving a lot of cattle corresponding to the number stolen from Johnson. The watchman recog-

nized and identified Conkling as one of the men driving these cattle. The cattle were driven across the Mississippi on the ice, and the men in charge of them took breakfast a few miles out on the road to Galena. Persons who saw them at this time, and on the road, and at Galena where the cattle were disposed of, testify, with more or less positiveness, that Cruise and Conkling were the men who were in charge of and who sold the cattle at Galena. The sale was effected at the latter place on Wednesday, the 14th day of December, and the money received for the cattle during the afternoon of that day. Galena is distant from Dubuque about fifteen or eighteen miles.

Further to identify the defendant and Conkling as the guilty parties, the State introduced as a witness one Cady, who testified in substance as follows :

"I live at Catfish, Iowa, about 2½ miles from Dubuque, on Cascade road; I know Conkling, and have known him since October last; he came to my house on the night of the 14th day of December; it was ten (10) minutes to 12 o'clock; he told me there was a man dead in the road; I lighted a candle, dressed myself and we went out to where the man was lying in the road; I turned him over, recognized him, and Mr. Conkling and I brought him into my house; then we (witness and Conkling) sat down by the stove; Conkling told me there was good sleighing on the other side of the river and poor sleighing here; the man we brought in was drunk; Conkling told me he came from Galena that night; he was on foot when he came to my door; when he was going to go off he went to two horses, one was a bay and one was saddled and one not; at no other time during last fall or winter was there a man brought into my house at night."

The evidence for the State tended strongly to show that the defendant and Conkling were the guilty parties. The defense was an *alibi*. Various witnesses were introduced

by the defendant, who testified that on the 14th day of December, and at the time when, according to the theory of the State, the parties were at Galena, the defendant was in fact at Dubuque. Without stating the testimony in detail, it suffices to say that if the witnesses introduced by the defendant were not mistaken as to the time, the defendant and Conkling are shown not to have been at Galena on the day when the cattle were sold. The evidence of the State tended, as above stated, to connect Cruise and Conkling as the guilty parties, and that of the defendant tended to show that neither Cruise nor Conkling was guilty. Among the witnesses called by the appellant was his co-indictee, Conkling, who, *inter alia*, testified in substance as follows: "I was at home on Tuesday, the 13th day of December." [This is near to or adjoining Johnson's, the owner of the stolen cattle.] "Cruise was there the fore-part of that day. On that day we butchered a beef. Cruise took part of it to town in a two horse wagon, and came back about nine o'clock with the team. Cruise and I staid at home that night." [The night the cattle were stolen.] "We both went into town on the 14th." Witness then testified as to where they stopped when in Dubuque that day, and of other matters, and is then asked: "Do you know a man named Cady at Catfish?" "I may have seen him, but don't know him; I know where he lives." "Did you ever stop there and see a man taken into his house?" "Yes." "When?" "It was some time before the 9th day of December. It was, I think, the 6th or 7th." "State what took place?" "I was going out home and saw a man lying in the road, and thought he was dead. I could not get my horse past him. I went over to the house and got the man out and got the drunken man into the house. I stayed a very short time. I don't think I told him where I came from." "How do you know it was before the 9th that you met

Cady?" "I know Cruise was in on the 9th, and I had told him about taking in this man; he said there was no house there. When I moved Cruise in on the 9th, I showed him the house." "What did you do with your horse when you took the man in?" "I hitched him. I had but one horse there. It was about 9½ o'clock." "Did you tell anybody else about this frozen man?" Yes; I told it at Mr. Devoney's. I told the two women there. I think it was on the 9th. I don't know how I came to tell them — how the conversation brought it about."

In this posture of the case the defendant then produced, as a witness, Mary Devoney, who testified "that she was acquainted with both prisoners, and that in the forepart of December, 1864, defendant, Conkling, took dinner at her house." The witness was then asked to state whether, at that time, Conkling had any conversation about taking up a drunken or frozen man on the road. An objection to this was sustained. "The defendants," so recites the bill of exceptions, "then offered to prove by the said witness, that on the 9th day of December, 1864, defendant, Conkling, was at the house of the witness and took dinner there, and at that time related to her that he had, a few nights before, on going home, found a man on the road and supposed at first that he was dead, but found that he was drunk, and that he assisted in taking the man into the house of Edward Cady, at Catfish mill." The State objected to this evidence; the court sustained the objection, and the defendant excepted.

The defendant was convicted, and appeals.

*Isaac L. Allen*, Attorney General, for the State.

*Bissell & Shiras* and *W. T. Barker* for the defendant.

DILLON, J. — According to the State's theory, Cruise and Conkling jointly stole the cattle on the night of the 13th of December, sold them in Galena on the afternoon of the 14th, and Conkling, with the two horses, was returning from Galena home *via* Catfish, on the night of the 14th, at the time he met the man he supposed to be dead, but who turned out to be drunken, in the road near Cady's. The testimony of Cady identifying Conkling as being at his house at midnight on the 14th, and leaving with two horses, was material, and of a most damaging character to the defendant. It harmonized with, and fortified the other evidence relied on by the prosecution, and tended very strongly, in connection with the other evidence, to point out Conkling and Cruise as the guilty parties. Its significance and its value depend entirely upon the *time*, the exact *day*, on which the circumstance deposed to by Cady took place. If it took place on the 6th or 7th, or at any other time than the night of the 14th, its inculpatory force, as against the defendant, would be entirely destroyed. Conkling, who was a witness in behalf of his co-indictee, testified that the circumstance relating to the drunken man took place as stated by Cady, but claimed that it occurred a week before. The *time* when the circumstance happened was therefore in dispute, and it was a dispute of a material character. It follows, that any evidence tending to show that the circumstance testified to by Cady, happened at the time stated by him, would be admissible to corroborate him. On the other hand, any evidence tending to show that it happened at the time stated by Conkling, would be admissible to corroborate him.

The case before us is peculiar in its character, and, under its special circumstances, we are of opinion that the facts offered to be shown by the witness, Mary Devoney (see

*[margin note: CRIMINAL LAW: evidence: declarations of prisoners.]*

statement), were competent evidence, and that the court erred in rejecting the testimony.

In thus holding the evidence admissible, we recognize the general rule that the law will not permit an offender to manufacture evidence in his own favor, and will not therefore allow him to introduce his own declarations when not part of the *res gestæ*. Thus, on an indictment against a prisoner for having counterfeit tools in his possession with intent to use them, he cannot give in evidence his declaration to an artificer at the time he employed him to make such instruments as to the purposes for which he wished them to be made. *Commonwealth* v. *Kent*, 6 Metc. 221; other illustrations, Whart. Cr. Law, 240, 259; *Shuck* v. *Vandewenter*, 4 G. Greene, 264.

But the present is not such a case. If Conkling, on the 9th day of December, did tell the witness, Mary Devoney, the circumstances of taking the drunken man into Cady's, this at once shows Cady to be mistaken when he fixes the time to have been the 14th, and corroborates Conkling's evidence fixing the time to have been the week previous. The days of miracles and of prophetic insight into the future have passed. Conkling, as early as the 9th, might have conceived the idea of stealing the cattle of his neighbor, Johnson, and have fixed on the night of the 13th to execute the illegal enterprise; but he could not have foreseen that on his return, on the night of the 14th, he would have met a man in the road near Cady's, and hence could not by any possibility have manufactured evidence of this character to be thereafter used by him for his own benefit.

The counsel for the appellant maintained the admissibility of this testimony, mainly on the general ground that Conkling was impeached by virtue of his relation to the cause, and that the party offering his evidence had the right to support it by showing that he had, on other occasions, made statements similar to those to which he testified on

the trial. The general rule is otherwise, and is well stated by Mr. Phillipps (2 Ev., 444, 446), and, with characteristic condensation and clearness, by Mr. Greenleaf (1 Ev., § 469). The case at bar would seem to fall within the exception to the general rule as there stated, if that exception is to be' regarded as established law.

But, in our opinion, the rejected testimony was proper, both as independent evidence on the question *as to the precise day of the month* it was that the drunken man was taken into Cady's, and as evidence tending to support Conkling's testimony. We have before had occasion to say, that whether a given item of testimony is proper, depends upon the exact attitude of the case (16 Iowa, 85), of which observation the more recent case of the *State of Iowa* v. *Knight*, *ante*, and the present are interesting illustrations. In support of the conclusion reached by us, see *Commonwealth* v. *Wilson*, 1 Gray, 337; Id., 103; Cow. & Hill's Notes, pt. 2, p. 763, 765, ch. 9, note 390; *Cook* v. *Curtis*, 6 Harr. & J., 93, 94; *People* v. *Vane*, 12 Wend., 78; *Regina* v. *Abraham*, 61 Eng. C. L. Rep., 550; *Henderson* v. *Jones*, 10 Serg. & R., 322; *State* v. *De Wolf*, 8 Conn., 93; 2 Hawkes, 183, 449. It becomes unnecessary to notice the other questions made, for the judgment must be reversed, because of the rejection of the testimony above noticed. We only observe, respecting the proof where the defense is an *alibi*, that the law is well stated, and, for most practical purposes, perhaps fully stated by SHAW, Ch. J., in the celebrated *Webster-Parkman* case, reported 5 Cush., 295. See *State* v. *Collins, post*. Judgment reversed and trial *de novo* awarded.

2. —— alibi: case approved.

Reversed.