W. E. LINGENFELTER, Appellee, v. W. C. ST. CLAIR, Appellant.

**PARTNERSHIP:** The Relation—Evidence—Sufficiency. Evidence re-
1    viewed, and held sufficient to establish a partnership.

**APPEAL AND ERROR:** Review, Scope of—Causes Triable De Novo.
2    Principle recognized that the court on appeal will, though passing on the cause *de novo*, give weight to the judgment of the trial court in an equitable cause.

**EVIDENCE:** Declarations—Self-Serving Declarations. Self-serving
3    declarations are not admissible to show that a party has always told a consistent story.

**PARTNERSHIP:** The Relation—Evidence—Sharing Losses. Princi-
4    ple recognized that an agreement to share ''losses'' is an essential element of a partnership.

**PARTNERSHIP:** The Relation — Evidence — Use of Firm Name.
5    Principle recognized that the continued use of a firm name is admissible as a fact bearing on the existence of a partnership.

**PARTNERSHIP:** The Relation—Evidence—Non-Control Over Busi-
6    ness. The fact that one may have a limited control over the management of a business is not necessarily conclusive that he is not a partner.

*Appeal from Polk District Court.—*HUBERT UTTERBACK,
Judge.

SATURDAY, JANUARY 20, 1917.

THIS is an action in equity, in which plaintiff claims that
defendant was a partner in the horse business.    Plaintiff
asks to have the alleged partnership dissolved, an accounting
had, and judgment against defendant for half the losses.    The
trial court found in favor of the plaintiff, and rendered judg-
ment against defendant for $1,715.44.    The defendant ap-
peals.—*Affirmed.*

*Parker, Parrish & Miller,* for appellant.

*Blake & Blake,* for appellee.

PRESTON, J.—1.    The petition alleges that the partner-
ship was formed in December, 1913, and that the agreement
was in parol; that the business was to be conducted under the
name of St. Clair & Lingenfelter, each to share profits and
losses equally; that each should furnish the funds equally,
and that plaintiff should handle all checks, plaintiff borrow-
ing all the money needed, upon his individual credit; that
the parties entered into such business in Des Moines, Iowa,
and continued to carry it on until August 1, 1914.

The answer denies that the parties entered into a con-
tract of partnership as alleged; defendant denies that he
agreed to share losses but avers that the actual contract was
that plaintiff was to carry on the business and defendant was
to work for him, defendant receiving one half the profits
as compensation.    Defendant also counterclaimed for $198.22
for money or goods advanced by him to plaintiff, less a pay-
ment thereon.

The reply admits that defendant furnished the goods
and money alleged in the counterclaim, but says that, by rea-
son of the alleged partnership, there was no merit in the

counterclaim; and the court took this matter into consideration in the accounting.

Numerous authorities are cited upon either side upon questions as to the admissibility of evidence and in regard to circumstantial evidence, partnership; rules for weighing evidence, and the like; but the question presented is almost entirely one of fact. We do not understand appellant to seriously question the amount found by the court to be due from defendant if the partnership was established, except as to one transaction with one Brown in regard to the shipment of some mules, which will be referred to later in the opinion.

The principal contest in the district court was, and is in this court, as to whether there was a contract of partnership, or whether defendant was acting for plaintiff as an employee.

The record is somewhat voluminous, the arguments taking up nearly 200 pages. To set out all the evidence and all the circumstances in an opinion would take up a considerable part of a volume of the reports. Such a case is of little value as a precedent, and, as we have often said, it is not our habit to attempt to set out the evidence in detail.

The case is triable in this court *de novo.* Very often the determination of such a case turns upon the credibility of the witnesses, and, as we have often said, the trial court, having seen and heard the witnesses, is in a better position to weigh the testimony than we can be, and for that reason some weight is given to the decision of the trial court. It is true, as appellant contends, that, where the Supreme Court is of the opinion that the lower court has made a mistake, it will reverse the case, and that otherwise an appeal in such a case would be useless. On the other hand, it is contended by appellee that a case will not be reversed unless the record makes it clear that a wrong conclusion has been reached, citing *Whitley v. Johnson,* 135 Iowa 620, at 624.

1. PARTNERSHIP: the relation: evidence: sufficiency.

We have heard it stated that in some cases trial judges in an equitable action feel that, as the case is triable *de novo* in the Supreme Court, it is unnecessary that they should as carefully consider the case as they would if it were not triable *de novo*. We think this is not the rule. Of course, a trial judge passing upon a case in that way does not perform his full duty. But where it appears from the record that the trial judge has patiently and carefully tried the case and conscientiously considered and weighed the testimony of all the witnesses and all the circumstances, we ought, because of the superior and more advantageous position of the trial judge, to give weight to his conclusion. In the view of the writer, perhaps we should give more weight than we ordinarily do to the conclusion of the trial court. In a law action, such finding is conclusive upon conflicting evidence; but under the law, the rule is different in equity cases, and we are required to weigh the evidence as best we may.

2. APPEAL AND ERROR: review: scope of: causes triable *de novo*.

It is thought by appellant that the only direct testimony in the case as to what the contract was is that of the plaintiff and the defendant, and that there are 50 to 75 other matters which appellant says constitute circumstantial evidence, and that some of the circumstances are such that one party claims they are inconsistent with plaintiff's assertion that there was a partnership, but consistent with defendant's claim that the relation was a hiring. Other circumstances are claimed by plaintiff to be inconsistent with defendant's version of their contract; but appellant contends that they are satisfactorily explained, or are insufficient to sustain the burden of proof on the part of plaintiff, and that other circumstances are consistent equally with the claims of both parties, and that they are, therefore, of no assistance either way in deciding the case. Appellant contends that these circumstances tend in a greater or less degree to corroborate one side or the other.

We cannot quite agree with appellant's claim that all

the matters outside the testimony of the parties are circumstantial. To illustrate: a number of plaintiff's witnesses testified as to admissions by defendant that he and plaintiff were partners, and that each was to share the profits and losses equally. It may be true that such verbal admissions are not evidence of the strongest character, and yet we think such evidence is direct evidence.

We shall attempt to set out the substance of the testimony, but as briefly as may be, without attempting to notice all the circumstances which tend to strengthen or weaken the testimony of the witnesses, or the contradictions thereof, either in the evidence of the witness himself or by some other witnesses. There was some little negotiation between the parties before the consummation of the contract, whatever it was. The parties had been acquainted for about 15 years; they had been in business for about three months, two or three years before the arrangement referred to in this case, under an agreement by which plaintiff bought horses, and defendant, who had a livery barn, fed them and kept them in the barn until sold, and received half what the horses brought, over their fair cost for feeding and sheltering them. As we understand it, it is not contended that the first arrangement was a partnership. Plaintiff had been in the horse business for 30 years, and claims to have been proficient in the business. There is some evidence tending to show that defendant was not a practical horseman, but there is other evidence that, though he had been in the livery business all his life and his experience was chiefly in that line, still he was a good horseman and a good judge of a horse and its value.

Omitting other circumstances shown in the record as to the preliminary negotiations, we shall proceed to refer to the substance of the testimony. As to the testimony of plaintiff as a witness, it is thought by appellant that plaintiff's testimony is weakened because, in some instances, the witness stated that he and the defendant agreed on certain terms,

and that such is the statement of a conclusion. Some of it may be in the nature of a conclusion, and yet it is sometimes difficult to say just what is and what is not a conclusion. *Moyers v. Fogarty*, 140 Iowa 701, at 712.

Plaintiff testified:

"A. We were to be full partners of everything. (Defendant moves to strike out the answer as giving an opinion and conclusion of the witness.)   Q. Just state what was said. A. Well, he agreed that if we could get the barn at what we thought it was worth,—Mr. Graham asked, as I remember, $100 a month, and we wanted it for less,—and if we could get the barn and could get the money, we would go in as partners, share and share alike. (Defendant moves to strike out the part of that answer in which the witness tells what the agreement was, as giving a conclusion and opinion of the witness and therefore incompetent.)   And we agreed on a full partnership, share and share alike. (Defendant moves to strike out the statement that they agreed on a full partnership, share and share alike, because incompetent and a conclusion. Court: It may stand subject to the objection. Excepted to.)   Q. But before you went to see about these things, what was said, if anything, about sharing in the profits and losses of the business?   A. After the first proposition was turned down, we talked of renting the barn, each paying half of the rent and half of the feed and half of everything.   Q. And after talking that you would each pay half of these things, what was said by you and by St. Clair as to what you would do, what did you each say about what you would do?   A. That was agreed upon, that we would accept that kind of terms. (Defendant moves to strike out the answer as incompetent and a conclusion. Court: Just say what was said and not what your understanding about the agreement was, that is what I have to decide.)   A. I do not know that I know how to answer that. I have answered it in the best way I could. A. When we talked over our arrangements and this business, profits and losses were dis-

cussed very minutely and very distinctly that it was a hazardous proposition. Q. And then following that what was said as to what each would share in the profits and losses? A. We was to share equally in profits and loss, copartners in everything pertaining to the business. (Defendant moves to strike out the answer as stating a conclusion. Court: Just tell what was said, Mr. Lingenfelter.) Q. The question is, did you state to Mr. St. Clair how you would take him in with you, or did you say how he would go in with you; if so, what was said by either of you with reference to your profits and losses or the share in the business? A. We were to rent the barn, and he said we would rent the barn, and we discussed the matter and went down and rented the barn. We talked that matter over and we rented the barn and he hired the men. And we talked of the possible loss and possible gains as parties would who were talking over the business, that is as near as I know how to answer."

At least a part of the foregoing is testimony as to what was said, and the following in the testimony of plaintiff as a witness is in the same line:

"Q. When you say you talked it over, who said they would pay half of the rent and half of the feed and everything? (Objected to as calling for a conclusion and opinion of the witness, and because assuming a state of facts to which the witness has not testified.) A. Both of us. I said to him, 'Well, we'll get a barn if we can find one, and we will run it together and we will go partners, you are a full partner, half and half.' We spoke about the money and I said to him, 'I have no whole lot of money on hand at the present time, but I guess we could arrange for it,' and he told me about a similar case about his own, he had some money in the country, but didn't have it in here; 'but we didn't have money enough to carry on the business.' . . . I proposed that if we could find a barn we would rent it and divide the rent equally, the feed, hired help and everything, provided

we could make arrangements for the money, and share half and half, would be partners in every sense, profit and loss. . . . We were to rent the barn, and he said we would rent the barn, and we discussed the matter and went down and rented the barn. We talked that matter over and we rented the barn and he hired the men. And we talked of the possible loss and possible gains, as parties would who were talking over the business. That is as near as I know how to answer it. . . . When I made the proposition to St. Clair of being full partners, half and half, he said 'All right.' ''

Appellant's version of the contract is, substantially, this; and some of this might also be thought to be a conclusion:

"Finally I told him, 'If you want to rent the barn, you can charge up the interest on your money and the country costs, and I will furnish my automobile and attend to the barn and look after it and help in the barn,' and we would split the profits for my work and automobile. I did not tell him I would do all the work, but he was to hire more when needed. I was to get one half for myself and the use of the automobile which I was to drive when close around Des Moines. I do not know just exactly what he said in answer to my proposition. He said we would go and look up a barn, or something, or find a barn. Q. Now did you at any time agree with Mr. Lingenfelter that you would go into partnership with him in handling these horses and stand one half of the losses? (Objected to as calling for a conclusion, and incompetent.) A. No, sir. (Plaintiff moves to strike out the answer for the same reason.) Mr. Lingenfelter did not suggest or propose to me a partnership no more than what there was. He wanted me to go in with him first, before I made my proposition, and I told him I would not do it. He wanted me to go into partnership with him and be partners. I told him I would not go in business and I would not put any money in a business. There was talk about a partner-

ship.  He made me that proposition and I declined it.  That was before I proposed to him to work there and take one half of the profits as my compensation.  Finally the proposition was made that he should buy the horses, rent the barn, hire the help, give his time, charge up interest on his money, and so on, and I would put in my time and the profits should be divided.  I do not know exactly what he said to that proposition.  He did not say that he did not want to do it, nor have I heretofore testified that he did say that.  I do not think he said much of anything.  He just wanted to rent a barn. . . . He told me he wanted me to look after the horses, to put down anything that came in, and find out where there was any horses in the country to sell, and to show the horses to anyone that came in and to see that they were fed and to look after the men.  I could not say when he told me that, but about the time he was running the barn.  I could not say just when he did tell me, but that is what he said he wanted me to do. . . . When Lingenfelter told me what he wanted me to do, I said, 'All right.'  He said he wanted me to stay at the barn looking after the horses and the men, sell a horse if I could, and hunt a buyer.  He did not say exactly he wanted me to hire men, but just to look after them. . . . The buying was not my end of the business.  I had nothing to do with that.  I was to help sell.''

Witness McKinney, a banker, testified for plaintiff that plaintiff and defendant came to his bank some time in December, 1913, to talk about starting a horse business; that they were over several different times and talked about getting some money if they decided to go into the business; that they finally said they would tackle it for six months and see what came out of it; he thinks there was something said about their partnership when they first talked of it,—that they expected to go in on the deal, and that, if they did not make anything, they would probably have money enough to pay their losses anyway.  He says further:

''My recollection is that Mr. St. Clair said that he

guessed that they both had enough to pay the losses if they did not make any money. I think St. Clair made some statement or remark about having his account at another bank and he could arrange for money or something of that sort. Later on they came over, and Mr. Lingenfelter made a note and Mr. St. Clair said that Lingenfelter would look after the financial end of the business. I was loaning to the firm, as I understood it. The reason I simply took Lingenfelter's name on these notes was that Mr. St. Clair had said that Lingenfelter would look after the financial end of the business and take care of the money, and so of course I knew Mr. Lingenfelter's responsibility, and it did not make any difference to me whether anybody else was on the note or not, and that is the reason, I suppose, that I did not ask Mr. St. Clair to sign."

Some of the evidence is denied by the defendant; he denies that he said to McKinney that he had money with which to pay losses, and denies that he said anything about his own bank account; and says that he did not talk about the horse business proposed to be started, and did not say that plaintiff would write the checks and take care of the financial end of the business.

Witness Turner testifies that, some time in the winter of 1913, he called on Mr. St. Clair and Mr. Lingenfelter to sell some feed; that they talked the matter over among themselves and said they would give the order; that witness asked the firm's name, if they were partners, whom he should bill it to; and that they said to Lingenfelter and St. Clair, or St. Clair and Lingenfelter, he does not remember which; that both said they were partners.

Witness Tramel says:

"At the time the automobile was referred to, St. Clair's interest in the business was mentioned, that he had a half interest in all the rest of the stuff, except that automobile, and Mr. Lingenfelter said, 'I have not got no interest in that; that belongs to St. Clair.' Both were present. They

were not very far apart when that was said. Lingenfelter made this remark. Both spoke about the half interest; that everything was in partnership except that automobile. This conversation was along in April or June, or sometime in the spring of 1914, at the barn.''

Witness Bishop testifies to selling them a horse in February, 1914, and that St. Clair said to him:

''We are buying this stuff together; I can only say what I would do; if I was here and buying this horse alone you might have your price; you know that I can only control half the money that goes into this horse, and Link is here, and I could not say anything in regard to his money when he is here to protect it.''

St. Clair denies this testimony.

Witness Long testifies:

''I was employed by a man by the name of Brown. I recall St. Clair leaving for St. Louis. . . . When he got ready to leave that afternoon he spoke about their having trouble with a shipment of their mules, and that he was going, and told me to stay there and take care of this stuff, and said, 'We will pay you from now on.' A few days before this they was talking about the mule deal, and I asked him if he was interested in mules, and he said he was, just the same as Link. I worked for Lingenfelter and St. Clair, and they paid me for three weeks. I told St. Clair my charge was the same as I was charging Brown, $15 a week, and he protested. We talked about it a little bit and Lingenfelter says, 'You fellows fix the amount and I will push the pencil.' The check was finally made for $45. St. Clair and I fixed the amount.''

Graham testifies:

''When they rented the barn and gave me the first check both were present, and each said they were in the horse business, I think, and we talked over renting the barn to the two of them; I heard them both say about the losses.''

This is denied by St. Clair.

Witness Proctor testifies substantially:

"I have often heard Mr. Lingenfelter, when speaking about going out after horses, Mr. St. Clair would. tell him, 'You go and buy them,' and he would say, 'No, I am not going unless you go along. I will not spend this money unless you are there to see it, or unless you go along. You are as much interested as I am,' or something like that. St. Clair would often tell Lingenfelter, 'You go,' and Lingenfelter would say, 'No, I want you to be there,' and I have heard him say repeatedly, 'If we are going to be partners I want you to know what is going on. You are as much interested as I am.' I have heard him say that a number of times."

This witness also says that, at the time when plaintiff was pressing defendant to straighten up the books, defendant got quite nervous and said:

" 'My God, Lingenfelter, I can't stand this. It will take my farm and I cannot stand it.' I asked how much the loss was, and St. Clair said it would run from $2,000 to $3,000, and Lingenfelter told me it was liable to run over $3,000."

Witness Wilson, a brother-in-law of defendant's, and his witness, after testifying about buying horses of them, and that he did not give the check to St. Clair, but gave it to Lingenfelter, said, upon being furnished with one of the checks he gave:

"The reason that I made that payable to W. C. St. Clair was because some I made to Mr. St. Clair and some to Mr. Lingenfelter. They were working there together. I did not know their business at all, and I wrote out one check to Mr. St. Clair and I wrote out one to Mr. Lingenfelter, and they said at the time that it did not make any difference who I made it to."

This witness also testifies that defendant bought straw of him.

Witness Worster says, in substance:

"In the latter part of July, 1914, I was at their barn and I was talking of going in business there if I quit the

farm. I talked with both of them, and both were present at the time I had these conversations. We talked about renting this barn and putting in feed there to sell, and buying some mules there to feed, and how we would run it. They talked about what they had bought and sold and what they had made and what they lost. They told me what certain horses had lost, and talked like they didn't want to give the barn up. They wanted to keep it and try to make the loss back. Lingenfelter said they didn't like to stop with a loss. St. Clair said he didn't want to have to sell his farm to help pay the loss. They spoke of one loss having occurred in New York state and another at St. Louis. Both were present during all of this time. . . . I told St. Clair we would buy him out if he didn't want to stay in. He said he wanted to stay in until the first of March following.''

Defendant testifies that he had no talks with Worster about selling out to him.

Moorehead, a witness for defendant, testified that defendant sometimes bought feed; also bought drugs for use in the barn. There is evidence also that defendant bought a carload of oats, and that he asked plaintiff to pay $100 down on the car, and that afterwards defendant paid the balance, $409.25, by check, and the evidence tends to show that these oats were fed to the stock kept in the barn.

There is evidence that these parties received letters addressed to the firm of St. Clair & Lingenfelter. The mail was addressed to them as a firm, and defendant had access to and received and opened the mail, the same as Lingenfelter.

Plaintiff testifies that the business was advertised in the papers more in January, February and March. The firm name was given in the advertisements as St. Clair & Lingenfelter. Plaintiff testifies that he always talked over the matter of advertisements and discussed with defendant what was put in them. One of the advertisements was introduced as an exhibit. Plaintiff also testifies:

''We procured insurance on our place of business in the

sum of $4,000. I do not recall the name of the company, but Mr. St. Clair seemed to be acquainted with the agent and said it was a good company. I do not have the policy of insurance; Mr. St. Clair had it, and I asked him for it, and he said he did not have it or could not find it when I went to have it canceled. I saw the policy. Q. In whose name was it drawn? (Objected to as not the best evidence.) A. St. Clair and Lingenfelter; the insurance was on horses and mules.''

Plaintiff offered in evidence a receipt for $40 to St. Clair & Lingenfelter, dated January 26, 1914, for the premium on the insurance just referred to. Plaintiff also testified that defendant ordered 2,000 cards like this:

''Phone Walnut 1925
''ST. CLAIR & LINGENFELTER
''Horses and Mules Bought and Sold
''50 to 60 Head on Hand All the Time
''111 Eleventh St.                    Des Moines, Iowa.''

He also says that a receipted bill which he produced, and which was introduced in evidence, was for these cards, and that he gave a check for printing the cards; that both of them handed out these cards, and that he had seen St. Clair hand them out; that they both handed them out to advertise the business; that it was one of these cards that they gave to Mr. Shearer.

Witness Proctor says:

''I think I was there when the business cards were ordered for them. As near as I can remember, Mr. St. Clair said he would get the cards. Exhibit N is one of their cards, I think. I have seen them hand these cards out. I think I have seen St. Clair hand them, or say to the men, 'Take one of our cards,' and hand them out a card. Have often heard each of them introduce the other as their partner. I have heard them use the expression, 'My partner,' very frequently, as I remember.''

Witness Worster says:

"St. Clair gave me one of his cards about the first of January, 1914; the card had on it, 'St. Clair & Lingenfelter, Horse Business.'"

Plaintiff testifies that they had a telephone which was in the name of St. Clair & Lingenfelter. Defendant testifies that the first time the matter came up as to the name in which the business should be carried on was when plaintiff said they ought to have a telephone so that people would know where they were, and that plaintiff wanted to know about putting both names in the books, and defendant said, "I guess that will be all right." A statement of the telephone company to Lingenfelter & St. Clair for $6.45 was offered in evidence. Eight or nine other statements of the telephone company for outside toll were also introduced in evidence, and other statements of the telephone company for monthly rental and tolls totalling $16.75 and two other receipts of the telephone company to Lingenfelter & St. Clair for $16.40. Separate telephone bills were introduced for plaintiff's phone at his house.

There is testimony that the parties subscribed for the Drover's Journal, ordered by defendant, and a receipt for. the subscription was introduced in evidence. Four electric light bills against Lingenfelter & St. Clair were presented and paid. The defendant testifies, in regard to stock shipped out in the name of the firm:

"Mr. Lingenfelter sent me to accompany a shipment of twenty-eight horses to Buffalo, New York, and gave me the cost of each horse, with instructions to sell them at private sale if I could and had a chance. Mr. Lingenfelter ordered the car and we all loaded it. I helped. He always told me what horses to get out and showed us which ones, and with respect to the Buffalo shipment he selected the horses to go in the car and helped load them. He billed them out to St. Clair & Lingenfelter or Lingenfelter & St. Clair. Horses shipped to Galesburg were billed to St. Clair & Lingenfelter,

or vice versa.  Mr. Lingenfelter said that if this was not done I would have no authority to sell a horse there before sale day.''

There is evidence that, about the time the parties quit business, defendant rented space in the barn for a team, and that this was without the knowledge of Lingenfelter.  Plaintiff testifies that he and defendant introduced each other to different people as partners, and that defendant introduced plaintiff to several parties in St. Louis as his partner, and that he introduced St. Clair to Mr. Shearer as his partner when they purchased the carload of oats.

Witness Tramel says that Lingenfelter introduced St. Clair to him as his partner.  Witness Woosley testifies to the same thing.  Witness Onstot testified that St. Clair introduced Lingenfelter as his partner, and that he heard them introduce each other to others as partners.  Witness Schuldt says that St. Clair introduced Lingenfelter to him as his partner some time in December, 1913, or January, 1914. Witness Proctor says that he has often heard each of them introduce the other as their partner.  Defendant denies all this, and says that he never introduced Lingenfelter as a partner in his life.

This is necessarily a brief summary of plaintiff's testimony.  We may not have noticed all of it, and, as stated, we have not attempted to set out the circumstances which qualify it, or the contradictions or alleged inaccuracies and inconsistencies therein.

Evidence for defendant, in addition to that of defendant himself as a witness, is:  Witness Boudewyn, a horse buyer, testifies to shoeing horses from the barn in 1914, and that plaintiff gave him directions with respect to what was to be done with the horses, and that once in a while plaintiff would lead a horse up himself, and that St. Clair led a few up; that they were generally brought up by men working about the barn; that St. Clair never gave any directions about

the horses; that Lingenfelter always paid by his personal checks. On cross-examination, he says he made out the bills to St. Clair & Lingenfelter, and that defendant never told him to make them out that way; that neither of them did.

Witness Jones says that he worked at the barn in 1913–14, the first time about Christmas, and that plaintiff paid him for this and other work done in January; that on one occasion defendant gave witness a check for one pay day on Saturday night when plaintiff did not have a blank check book; that Lingenfelter called defendant into the office and asked if he would pay the boys that night, and St. Clair paid witness; that was the only time he did so; that he got directions as to his work from both, but that they did not pay much attention to St. Clair's directions; that Lingenfelter said he was running that place; that he heard plaintiff get after defendant on several mornings about not getting down earlier.

Witness Moorehead testified that he was employed to do work at the barn the first time Christmas Eve in 1913; that plaintiff employed him; he received his pay from plaintiff; that plaintiff gave him directions as to the work he should do at the barn; he also received directions from defendant; that, if these directions conflicted, he followed plaintiff's; that they did conflict sometimes, and plaintiff told him he was running the barn and that he wanted it done as he said; there was conflict in the directions about feeding the horses and giving them medicine.

An account book, an ordinary scratch book, was introduced in evidence and has been certified. The book was kept by Mrs. Lingenfelter in part and by defendant and his wife in part. Some of the entries are made by defendant, not as many, perhaps, as by others. It was kept a part of the time at defendant's house and a part at plaintiff's, perhaps the larger part at plaintiff's. The entries at the top of the first page are in the handwriting of Lingenfelter and his

wife. Defendant claims that the words, "St. Clair & Lingenfelter," at the top of the page, were not there when defendant examined the book shortly before they quit business.

It is thought by appellant that the evidence of witness Gill is competent, and corroborates defendant's story as to what the contract was. It appears that this witness met defendant, and, in a conversation with him, defendant detailed the contract he had with plaintiff, and its terms. The witness testified, over objection, to what defendant told him the contract was. This statement by Gill to defendant was had after the parties had made their contract, but it was at a time when no sales had been made and no business done except to buy some horses, and no losses had been incurred. Plaintiff was not present at this conversation. It was on a passenger train when witness and defendant were coming from Kansas City, and was about Christmas, 1913. It is thought by appellant that the testimony was admissible for the purpose of showing that defendant had always told a consistent story, and had not manufactured his testimony upon the stand or after learning of losses. Appellant cites, as sustaining his contention that the evidence is admissible, 2 Wigmore on Evidence, pp. 1327 and 1329; *State v. Cruise,* 19 Iowa 312; *State v. Vincent,* 24 Iowa 570.

3. EVIDENCE: declarations: self-serving declarations.

There may be cases where self-serving declarations of a party are admissible, but we think this is not one of them. As said in Jones on Evidence (Pocket Edition), Sec. 235:

"It is a general rule of broad application that the declarations of a party in his own favor are not admissible in his behalf."

In *Murray v. Cone,* 26 Iowa 276, at 279, it was said:

"Evidence of the contract and what was said at the time and in relation thereto would, of course, be competent. But the plaintiff's declarations on this subject, made to his wife, at a period distinctly subsequent to the contract, are no part

of the *res gestae* and should have been rejected. They were his own narration of a past occurrence.''

The last two cases are cited by appellee. See further, 9 Encyc. of Ev., page 545, under title of ''Partnership,'' which cites, among a number of other cases, *Danforth v. Carter*, 4 Iowa 230; *Southern White-Lead Co. v. Haas*, 73 Iowa 399.

2.   It is next contended by appellant that, even though we should come to the conclusion that the parties were partners, still we should send the case back for a new accounting,

4. PARTNERSHIP: the relation: evidence: sharing losses.   because plaintiff failed to separate the losses in a transaction with one Brown from other losses. It appears that an arrangement was made, either between plaintiff and one Brown, as appellant contends, or between the firm of St. Clair & Lingenfelter and Brown, to buy mules, ship them to Virginia, and divide the profits. The mules were bought and shipped, but did not reach Virginia, because at Kansas City Mr. Brown represented himself to be St. Clair, and was thus fraudulently enabled to procure the mules from the railroad company and sold them to others. The fraud was discovered and the transaction rescinded and the mules recovered, but there was some expense and loss occasioned by the transaction.

The thought of appellant is that this transaction was either the formation of a partnership with the three individuals as members, or a partnership between plaintiff and Brown, with defendant an employee of that partnership, to be paid in profits for driving them about the country. It is said that, if this be true, then the formation of such a new partnership necessarily put an end to the old partnership of St. Clair & Lingenfelter, and that any losses which accrued from and after the formation of such new firm would have to be settled for in a suit for dissolution among the members of that new firm, and that the losses occurring in that transaction and to that alleged new firm could not be considered in this case, because it would be necessary that all the partners should be in the case.

A further claim is that the judgment below includes not only the losses occurring before the Brown transaction, but also the losses occurring afterwards. To sustain the proposition as to the formation of the alleged new partnership and the effect thereof, appellant cites: *Hatchett v. Blanton*, 72 Ala. 423; *McCall v. Moss*, 112 Ill. 493; *Mudd v. Bast*, 34 Mo. 465; *Bank of Mobile v. Andrews*, 34 Tenn. 535; *Peters v. McWilliams*, 78 Va. 567; *Setzer v. Beale*, 19 W. Va. 274; *Noonan v. Nunan* (Calif.), 18 Pac. 98; *Mumford v. McKay*, 8 Wend. (N. Y.) 441 (24 Am. Dec. 34); *McGlensey v. Cox* 5 Clark (Pa.) 203; *Bean v. Warden* (Tex.), 31 S. W. 831.

But we think the trouble with appellant's contention at this point is that the testimony does not sustain their claim that there was any such new partnership, because it does not appear that there was to be any sharing of the losses between the parties to the arrangement about the mules.

On the other branch of the case, appellant has argued and cited the following Iowa cases, to the point that, in Iowa, to constitute a partnership, there must be an agreement not only to share the profits, but the losses: *Winter v. Pipher*, 96 Iowa 17; *McBride v. Ricketts*, 98 Iowa 539; *Richardson v. Carlton*, 109 Iowa 515; *Johnson v. Carter*, 120 Iowa 355. And that contracts between employer and employee, or principal and agent, where a share in profits is given as compensation for labor and services do not create partnerships, citing the same cases and *Holbrook v. Oberne*, 56 Iowa 324.

The circumstances in this case do not justify the inference that the arrangement with Brown was that the parties to that transaction were to share the losses on the mule shipment, if any, as was the case in *Richards v. Grinnell*, 63 Iowa 44, 51, and *Johnson v. Carter*, supra.

The defendant avers that such a new partnership was formed, and as to that issue would have the burden of proof. In regard to this transaction, the plaintiff testifies that the plaintiff was to buy mules and ship them to Virginia and sell them to mine operators; and that Brown was to have one half

the net profits, plaintiff one fourth and defendant one fourth; and that a carload or more of mules was purchased under that arrangement. The defendant testifies that plaintiff said he had to give Brown half the profits; and that he (plaintiff) would divide his profits with defendant if defendant would stay and drive the car; and that he did drive plaintiff and Brown about the country for two weeks. Defendant also testified:

"The mules had been billed from St. Clair & Lingenfelter to St. Clair & Lingenfelter. I did that myself."

The billing of the mules in this manner is explained by defendant, by saying that plaintiff told him to so bill them, because it was supposed that defendant was going with the mules, and that he billed them in that way before it was concluded he should not go.

Witness Proctor testifies that he heard defendant say, when it was learned that Brown was acting fraudulently:

"They are our mules. I am St. Clair, and those are our mules, and you hold the man. He is not St. Clair."

This was a conversation by St. Clair over the telephone with parties in St. Louis. There was some other evidence on this feature of the case; but, as said, we think the evidence does not sustain appellant's claim as to such new partnership, and that there was no change in the relationship of St. Clair & Lingenfelter as a co-partnership, but merely an additional arrangement as a firm with Brown, whereby Brown was to be paid one half of the net profits, for his services in helping buy the mules, in which arrangement both St. Clair and Lingenfelter took part. They were to share equally, as in all their partnership business. We should have said that there is evidence tending to show that the expenses and losses of the Brown transaction were figured over by both plaintiff and defendant, and agreed upon.

On the merits of the whole case, some other points are made as to the weight to be given certain testimony, which

will be noticed as briefly as may be. It is said that the tes-

**5. PARTNERSHIP: the relation: evidence: use of firm name.**

timony that plaintiff and defendant used the name of St. Clair & Lingenfelter in connection with the business is not conclusive upon the question as to whether a partnership exists, and is consistent with the stories of both parties. This may be true as between the parties; still we think that, even though it is not conclusive, such evidence, in connection with the other circumstances in the case, may be properly considered as tending to show that there was a partnership.

It is also said that the use of the word partner by the parties is not necessarily conclusive, because it may be, and often is, used in a general popular sense to denote a mere association together in business, but without intending to denote that it stands for any particular terms in the contract between such parties.

It is also said by appellant that, in a genuine partnership, there is full control of each partner over all the partnership funds, the making of contracts, the incurring of liabilities, the managing of the whole business,

**6. PARTNERSHIP: the relation: evidence: non-control over business.**

and the disposing of the property. Doubtless this is the general rule; but, to some extent at least, this may depend upon the agreement between the parties. One may be a managing partner, if it be so agreed, and the duties and the manner of conducting the business may be qualified in some of the matters by agreement.

There may be other points argued which we have not specifically noted, but all points have been considered, and, upon the whole case, it is our conclusion that the trial court correctly decided the issues, and its judgment and decree is, therefore,—*Affirmed*.

GAYNOR, C. J., WEAVER and EVANS, JJ., concur.