[Crim. No. 1105.   Second Appellate District, Division Two.—October 30, 1924.]

## THE PEOPLE, Respondent, v. VIVIAN WALKER, Appellant.

[1] CRIMINAL LAW—OBTAINING MONEY BY FALSE PRETENSES—REPRESENTATIONS—PLEADING.—In this prosecution for obtaining money by false pretenses, in which the information charged that the complaining witnesses paid to defendant a specified sum of money for a partnership interest in a business conducted by defendant as a divine healer, and that the payment was made because of false representations which defendant made to the complaining witnesses that she "was . . . a divine healer, and that she . . . had patients, suffering from confining illnesses, maladies and diseases, sufficient in number to more than fill an eleven-room sanitarium or house sufficient to accommodate the aforesaid number of patients . . . ; and that she . . . had a patient with whom she had an agreement to pay her" a specified sum "for treatments, and that she . . . had another patient with whom she had an agreement to pay her" a specified sum "for treatments, and that she . . . had sufficient patients and business to bring an income" of a specified sum per month, defendant's demurrer predicated upon alleged inability to ascertain the meaning of certain terms used in the information was properly overruled, where the portions of the information in question were merely an exposition of what defendant represented to the complaining witnesses.

[2] ID.—DIVINE HEALER DEFINED—REPRESENTATION OF FACT.—A divine healer is one who is capable of healing the sick and afflicted through divine interposition induced or made active or efficacious by means of prayer or supplication; and the representation by a

---

1.  See 14 Cal. Jur. 84; 12 Cal. Jur. 464.

2.  Statutes regulating practice of medicine as applicable to healers, notes, 3 L. R. A. (N. S.) 763; 24 L. R. A. (N. S.) 103; 25 L. R. A. (N. S.) 1297; L. R. A. 1917C, 827.

person that she is a divine healer is a representation of fact, peculiarly within her knowledge, and not a mere matter of opinion.

[3] ID.—MAGNITUDE OF DEFENDANT'S BUSINESS—REPRESENTATIONS OF FACT.—The representations that defendant had enough patients to more than fill an eleven-room sanitarium, that she was seeking to lease a sanitarium or house sufficient to accommodate her patients who were suffering from confining illnesses, and that she had sufficient patients and business to bring in a specified income per month, were material representations as to matters of fact, peculiarly within the knowledge of defendant and as to which the prosecuting witnesses knew nothing aside from the subject matter of defendant's assertions, designed to assure the prosecuting witnesses as to the magnitude of defendant's business, and upon which the prosecuting witnesses had the right to rely.

[4] ID.—EXISTENCE OF CONTRACTS—ABSENCE OF RIGHT TO PARTICIPATE IN PROCEEDS—MATERIAL MISREPRESENTATIONS.—Conceding that the information failed to charge that the prosecuting witnesses were to participate in the fruits of the two contracts which defendant represented she had with patients who had agreed thereby to pay her certain specified sums for treatments, such alleged misrepresentations were not made innocuous by the absence of such charge, as the representations as alleged conveyed to the prosecuting witnesses the idea that the business of defendant was one of importance and they naturally gave rise to the expectation on their part that similar contracts might come to the concern after they became joint owners in it; and to that extent these charges of misrepresentation pleaded material representations and the information as a whole was aided by them.

[5] ID.—HEALING OPERATIONS OF DAUGHTER—IRRELEVANT EVIDENCE.— In this prosecution for obtaining money by false pretenses, arising out of the sale to the prosecuting witnesses of an interest in a business conducted by defendant as a divine healer, testimony that in her absence defendant allowed her minor daughter to conduct the healing operations usually conducted by herself was erroneously admitted.

[6] ID.—INABILITY OF WITNESS TO SPEAK—IMPROPER APPOINTMENT OF WIFE AS INTERPRETER.—In this prosecution for obtaining money

---

3. False pretenses where party injured might have ascertained truth by ordinary prudence, note, 40 **Am. Rep.** 75. See, also, 11 **R. C. L.** 846; 12 **Cal. Jur.** 453, 456.

4. Extent to which false pretenses must be calculated to deceive, note, 7 **Ann. Cas.** 32.

6. Competency of interpreter as affected by relationship to party, note, **Ann. Cas.** 1913D, 286.

Admissibility of evidence given through interpreter, note, 17 **L. R. A.** 813. See, also, 28 **R. C. L.** 587.

by false pretenses, the trial court erred in permitting the wife of one of the witnesses for the prosecution to be sworn as an "interpreter" for the purpose of conveying to the court and jury the answers of said witness, where the physical condition of said witness was such that he could give forth no sound, not even a whisper, by means of the organs of speech, and, if it could not be said that there was no movement of his lips whatever, there was none which conveyed to any person but his wife the impression that he attempted to put forth articulate speech in response to the questions which were propounded to him, and his answers, if he made any, were interpreted to the jury through no system which anyone but the wife could understand.

[7] ID.—HEALING POWERS OF DEFENDANT—FAILURE TO CURE PATIENTS. In a prosecution for obtaining money by false pretenses, arising out of the sale to the prosecuting witnesses of an interest in a business conducted by defendant as a divine healer, it is not error to permit witnesses for the prosecution to testify over the objection of defendant that she had treated them for physical ills and that they had not been benefited by her ministrations, as such testimony is admissible as tending to prove that defendant could not heal.

[8] ID.—FALSE REPRESENTATION—QUANTUM AND CHARACTER OF EVIDENCE—INSTRUCTIONS.—In a prosecution for obtaining money by false pretenses, it is proper to instruct the jury that "It is not necessary, in order to establish the falsity of the representation, that the proof should be direct, but such evidence must be given, or such facts established, as tend logically and necessarily to prove them."

[9] ID.—OTHER OFFENSES—EVIDENCE—INSTRUCTIONS.—In such a prosecution, any error in the instruction that "If testimony in regard to other representations has been introduced here, they cannot be considered in establishing the guilt of defendant by themselves but may .only be considered as showing the intent of the defendant in regard to allegations or the statement of misrepresentations alleged to have been made in the information," will be held harmless where it is not shown that there was evidence of other offenses.

[10] ID.—PREJUDICIAL ERRORS—APPEAL.—In this prosecution for obtaining money by false pretenses, arising out of the sale to the prosecuting witnesses of a partnership interest in a business being conducted by defendant as a divine healer, the appellate court could not say that defendant would or would not have been con-

---

7.  See 11 R. C. L. 864; 12 Cal. Jur. 471.
8.  See 12 Cal. Jur. 473.
9.  See 11 R. C. L. 867; 12 Cal. Jur. 472.

victed but for the errors of the trial court; and under such circumstances the provisions of section 4½ of article VI of the constitution may not be availed of to support the judgment of conviction.

(1) 31 C. J., p. 662, sec. 180.    (2) 18 C. J., p. 1407; 25 C. J., p. 595, sec. 19.    (3) 25 C. J., p. 595, sec. 19.    (4) 25 C. J., p. 592, sec. 13. (5) 25 C. J., p. 648, sec. 85.    (6) 40 Cyc., p. 2413.    (7) 25 C. J., p. 647, sec. 85.    (8) 25 C. J., p. 655, sec. 95.    (9) 17 C. J., p. 342, sec. 3690.    (10) 17 C. J., p. 369, sec. 3751.

APPEAL from a judgment of the Superior Court of San Diego County. E. A. Luce, Judge. Reversed.

The facts are stated in the opinion of the court.

Edward J. Kelly and Shreve, Dorn & Shreve for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

WORKS, J.—Defendant was convicted of the crime of obtaining money by false pretenses. The information charges that one Elgin and his wife paid to defendant $1,500 for a partnership interest in a business conducted by her as a divine healer, and that the payment was made because of false representations which defendant made to the Elgins that she "was . . . a divine healer, and that she . . . had patients, suffering from confining illnesses, maladies and diseases, sufficient in number to more than fill an eleven-room sanitarium or house, and that she . . . was . . . seeking to lease or rent a sanitarium or house sufficient to accommodate the aforesaid number of patients . . . ; and that she . . . had a patient with whom she had an agreement to pay her the sum of $1,500.00 for treatments, and that she . . . had another patient with whom she had an agreement to pay her the sum of $2,000.00 for treatments, and that she . . . had sufficient patients and business to bring in an income of $1,000.00 per month." Defendant appeals from the judgment of conviction and from an order denying her motion for a new trial.

Appellant interposed demurrer to the information on various grounds. The demurrer was overruled and it is now

insisted that it should have been sustained. [1] A part of the grounds of demurrer upon which reliance is now placed are these: That it cannot be ascertained from the information what is meant by the term "divine healer"; that it cannot be ascertained therefrom what is meant by the adjective confining, as qualifying the nouns illnesses, maladies, and diseases; and that it cannot be ascertained therefrom how many patients will fill or more than fill an eleven-room house or sanitarium. None of these points is well taken. They are all directed at portions of the information which are devoted to an exposition of what appellant represented to the Elgins. As performers of that office the allegations are not subject to the charge of uncertainty, for they avowedly state exactly what the misrepresentations were.

Two points are presented under the general demurrer, first, that all of the misrepresentations charged, except two, were expressions of opinion based upon expectation and hope, and, second, that as to the excepted two, those relating to alleged agreements with patients who were bound to pay, respectively, $1,500 and $2,000 for treatment, there is no allegation that it was represented that the Elgins were to participate in the fruits of the agreements. Concerning the representations which are claimed to have been mere expressions of opinion, it is our view that some of them, at least, were not so. This can surely be said as to the representation that appellant was a divine healer, and in order to justify the assertion it becomes necessary to examine into the meaning of that term. We are satisfied that upon a common understanding which, indeed, has found expression or has been accorded notice in legislative enactment and judicial decision, we may formulate an adequate definition of the term. The Medical Practice Act of this state contains a provision that it shall not be construed so as "to regulate, prohibit or to apply to, any kind of treatment by prayer, nor to interfere in any way with the practice of religion" (Stats. 1919, p. 1297; Deering's Supp. to Codes & Gen. Laws, 1917–21, p. 1627), and the same or a similar provision has been carried in the statute law of the state ever since 1907, in which year the legislature incorporated in the Medical Practice Act a clause to the effect that the enactment was not so to be construed as "to interfere in any way with

the practice of religion; provided that nothing herein shall be held to apply [*sic*] or to regulate any kind of treatment by prayer'' (Stats. 1907, p. 259). ''Divine healers,'' specifically so called, have been before the courts in a few instances, and whenever the nature of their practice has been in question it has appeared that they have claimed the power to heal through prayer to God (*Smith* v. *People,* 51 Colo. 270 [36 L. R. A. (N. S.) 158, 117 Pac. 612]). The cases of other persons, not known by the specific designation mentioned, but who have attempted their healing work through the instrumentality of prayer, have several times been passed on by the courts (*Fealy* v. *City of Birmingham,* 15 Ala. App. 367 [73 South. 296]; *People* v. *Krause,* 291 Ill. 64 [125 N. E. 726]). And see an opinion of one of the courts of this state (*Ex parte Bohannon,* 14 Cal. App. 321 [111 Pac. 1039]), for a statement concerning the more or less prevalent belief in the efficacy of prayer as a medium through which the sick and afflicted may be relieved of their distresses.

[2] Appellant represented that she was a ''divine healer.'' Taking the well-known meaning of the two words of which this expression is composed, and, moreover, considering them and the expression itself in the light of the common understanding to which we have referred, we may define a divine healer as one who is capable of healing the sick and afflicted through divine interposition induced or made active or efficacious by means of prayer or supplication. In representing herself to be possessed of this power, did not appellant make representation of a fact? Whether she did possess it appears to us to have been a matter of fact, and, not only so, but one peculiarly within her own knowledge. Whether she was able to heal through the agency of prayer was better known to herself than to any other person. Her representation was not mere matter of opinion.

[3] Then, too, we are convinced that the representation that appellant had enough patients to more than fill an eleven-room sanitarium was one of fact. So much seems to be apparent upon the face of the statement. If we regard the representation as ambiguous beyond a certain point, we are to observe that appellant meant by it to convey the idea that she had at least eleven patients of the character re-

ferred to in the representation, or, if not that, it surely conveyed the idea, considering that the alleged patients were said to be suffering from confining illnesses, maladies, and diseases, that appellant was engaged in the conduct of a business of some magnitude and it was to that extent a material representation. . The alleged misrepresentation that appellant was seeking to lease a sanitarium or house sufficient to accommodate her patients who were suffering from confining illnesses was plainly a statement of fact, and it was a material statement for the reason that it necessarily gave to the Elgins the impression that appellant was the owner of a flourishing business—one which was progressing so well that new and commodious quarters were necessary to the conduct of its operations. We cannot but regard appellant's alleged statement that she had sufficient patients and business to bring in an income of $1,000 per month as a representation of fact. The statement did not relate to the future but to the time at which it was made. It was an assurance as to the then present magnitude of the business and it conveyed alleged information which was peculiarly within the possession of appellant and concerning which the Elgins knew nothing aside from the subject matter of appellant's assertion. The representation as charged was made in the form of a statement of fact, and as such, under all the circumstances disclosed upon the face of the information, the Elgins had the right to rely upon it (*Palladine* v. *Imperial V. F. Lands,* 65 Cal. App. 727 [225 Pac. 291]). It was of course a material representation. ·

[4] Coming now to the claim that the information fails to charge that the Elgins were to participate in the fruits of the two contracts which appellant represented she had with patients who have agreed thereby, respectively, to pay her $1,500 and $2,000 for treatments, and that it was therefore insufficient, we must remark that the alleged misrepresentations were not made innocuous by the absence of that particular charge. Under the allegation as it stands the representations conveyed to the Elgins the idea that the business of appellant was one of importance and they naturally gave rise to the expectation on their part that similar contracts might come to the concern after they became joint owners in it. To that extent these charges of misrepresentation

pleaded material representations and the information as a whole was aided by them.

[5] Over the objection of appellant the trial court allowed the prosecution to prove that in her absence appellant allowed her fourteen year old daughter to conduct the healing operations usually conducted by herself. A part of the testimony concerning the daughter follows: "Q. Did she at any time take any part in any treatments? A. Yes, sir. Q. What part did she take? . . . A. She did the healing when her mother was not in; her mother left her in charge of the patients. Q. By doing the healing, what do you mean she did? A. She prayed over them the same as her mother did. . . . I just saw her go over—she held her hand up this way and went over something. . . . The Court: [On motion therefor] The word 'pray' may be stricken out. . . . Q. Did you hear any conversation between the daughter and Mrs. Walker as to whether or not the daughter was to do this thing? A. Yes, sir. . . . She said that right before me. She left Gabriel [the daughter] in charge of her patients, and she said, 'She can heal just as good as I can.'" It is contended that the court erred in admitting this evidence. No answer is made to this contention in respondent's brief, but the theory upon which the evidence was received is shown by statements made at the trial and in the presence of the jury by the district attorney and by the trial judge. Upon objection to the question, "What part did she take?" the following colloquy took place: "The Court: I do not know what materiality it would be. Mr. Kempley [the district attorney]: I think it is a very strong circumstance whether this lady was a divine healer or any kind of a healer. . . . The Court: It might go to the question of what her healing powers were. . . . This goes to the point whether or not she was a divine healer or whether that was a false representation, and I expect the way to get at that is by facts and circumstances. . . . Mr. Kempley: It is one of the circumstances that was most convincing to me, and I believe it would be convincing to the jury." We cannot agree with the trial judge and the district attorney. There is no question here as to the propriety or impropriety of the act of appellant in confiding to her daughter a duty which she herself was employed

to perform, granting that she was employed to perform it without the assistance of the daughter, a question upon which the record is silent. We can, however, conceive of no other point to which the evidence could have been directed, legitimately. Certainly, we cannot perceive that the testimony indicated whether appellant could or could not heal. Her daughter may have been able to heal, she may have possessed that power in greater degree than did her parent, or she may have possessed it in no degree whatever. Upon neither of these postulates did the evidence tend to show that appellant did not possess it. The same line of evidence was also developed, over the objection of appellant, from a witness other than the one whose testimony is set forth in part above. The court erred in permitting the evidence.

[6] The next point to be considered is of a most unusual character. The prosecution called one Graham as a witness. The physical appearance of this individual and certain other circumstances are thus disclosed by the record: There are first shown various questions and answers concerning the name and place of residence of the witness and concerning his acquaintance with appellant. A colloquy then occurred between the court and respective counsel, during which the following appears: "Mr. Kelly: . . . I want at this time the record to show that this witness was brought in here by the assistant district attorney, Mr. Johnson, and by the wife of the witness in a crippled condition, almost impossible for him to walk, and impossible for him to speak; so that his wife makes the answer for him; and I assign it as misconduct . . . on the part of the district attorney on the ground that the witness' testimony is immaterial, incompetent, irrelevant and . . . that he was brought in here solely to prejudice this defendant before the jury. . . . The Court: Go ahead, Mr. Kempley." Several questions, some of which met with objections, were then put to the witness and the record shows answers to them. Then the following transpired: "Mr. Kelly: I wish the record to show that all of these answers are made by the wife of the witness, and that it is impossible for anyone, including the reporter— The Court: The record is not going to be made just the way you recite it, Mr. Kelly. You cannot say 'Let the record show,' and then recite a lot of things when the answers are

made by the witness and repeated by the wife to the jury. Mr. Kelly: Then I will ask that the Court . . . make the record show that this witness cannot speak loud enough to be heard even by those in his immediate vicinity. . . . Standing right along beside of him I cannot even hear him whisper." The judge made no statement into the record pursuant to this request. After a colloquy a question was put. The record then shows: "A. He said 'No.' Mr. Kelly: Did your honor hear that? The Court: No, I did not hear that. A. Did you see his mouth? The Court: No. It has got to be a little more distinct than that, I fear. . . . Well, it is not audible enough. . . . Mr. Kelly: . . . There is no means by which we can say it is [the testimony of this witness]. I stood here and I tried to hear a whisper. . . . The Court: You can start all over again if you want to, but . . . there should be some reply [from the witness himself]. Mr. Kempley: She is the wife of the witness and she undoubtedly can see things that we cannot." Various questions were then propounded to the witness, after which this appears: "Mr. Kelly: . . . There are no answers given by the witness so far as I can see." This is all that is shown by the record as to the appearance of the witness on the stand. Up to the point at which the trial judge stated that the district attorney might recommence his examination of the witness, his wife had conveyed his answers to the jury, if answers there were, under a stipulation which was stated to have been made before the trial, but it transpired that the stipulation was not broad enough to cover the situation which arose as above outlined, and appellant was by the court relieved from it. In addition to directing that the examination be begun again the court struck out the testimony of the witness shown by the record up to that point. The district attorney then commenced the examination anew after this statement by the judge: "There must be some testimony from the witness himself. . . Now you can try it again if you want to, with a few questions." After several preliminary questions, to which answers were stated into the record by the wife of the witness, the following occurred: "Mr. Kempley: Now do you want Mrs. Graham sworn that she will repeat his answers? Mr. Kelly: I submit . . . it is not a case where an interpreter can act. It is not apparent here that Mrs. Graham can understand his answers. There are no answers

given by the witness so far as I can see [this being a statement already quoted]. It is not the testimony of the witness, but the testimony of the interpreter. The Court: You can swear her to repeat them correctly. Mr. Kelly: How can she be sworn? She is not an interpreter from Spanish into English, or *vice versa*. What can she swear to do? The Court: You can swear her to repeat correctly the answers. (Ella Graham is sworn to correctly repeat the statements made by the witness Fred Graham.)'' The examination then proceeded in the manner directed by the judge and was concluded. It is now contended that error was committed by the court in swearing Mrs. Graham to repeat the statements of the witness and in permitting her to recite answers to the jury. No response is made to this contention in the brief of respondent, but we cannot but regard it as both important and serious.

Before we proceed to a discussion of the questions of law presented by the point thus suggested by appellant it will conduce to clarity if we make some further remark as to the state of the record before us. While the showing is not as clear as it might be, because of the failure of the trial judge, pursuant to a minute survey of the appearance of the witness Graham and following the urgent request of counsel for defendant, to state into the record what that appearance was, we shall endeavor to outline what, to our minds, the record does show. It appears certainly and conclusively that the witness could give forth no sound, not even a whisper, by means of the organs of speech. It sufficiently appears that, if it cannot be said that there was no movement of his lips whatever, there was none which conveyed to any person but his wife the impression that he attempted to put forth articulate speech in response to the questions which were propounded to him. This condition of affairs is shown by the repeated statements of Mr. Kelly, to which, finally, the trial judge took no exception, and which were more than acquiesced in by Mr. Kempley, for he made one affirmative and pertinent statement on the subject. Mr. Kelly said: ''There is no means by which we can say it is the testimony of this witness. . . . There are no answers given by the witness so far as I can see.'' Mr. Kempley's remark was: ''She is the wife of the witness and she undoubtedly can see things that we cannot.'' In addition to

this state of facts it is to be observed that there was no attempt to show, either by way of preliminary or in response to the objection made by Mr. Kelly, by what means Mrs. Graham possessed or assumed an ability to understand what her husband said, or, in fact, that he actually said anything. She was not only left a free hand to repeat what he said, if he really spoke, but to decide whether he spoke. No one else could determine, we think the record shows, that he even attempted to speak. Certainly, if he made answers, they were interpreted to the jury through no system which anyone but the wife could understand. Such is not the case in the ordinary instances in which interpreters are employed in courts of justice, those in which a translation from one language into another is essayed, or in which the testimony of a deaf-mute, given in the common language of such unfortunates, is conveyed to a jury by adepts in it. The errors or perjuries of the usual interpreter are subject to detection and correction. The same thing may not be said of the efforts of Mrs. Graham. She could "interpret," she could answer, with complete immunity from fear of contradiction, impeachment, or punishment. She might commit errors or she might commit the crime of perjury and go scot-free.

Section 1884 of the Code of Civil Procedure provides: "When a witness does not understand and speak the English language, an interpreter must be sworn to interpret for him." This enactment, however, is not exclusive, as it is undoubtedly the rule not only that courts of general jurisdiction have inherent power to swear interpreters whenever such a course is necessary to the due administration of justice (*Supervisors* v. *Le Clerc*, 3 Pinn. (Wis.) 325; *Cavasos* v. *Gonzales*, 33 Tex. 133; *De Baca* v. *Pueblo of Santo Domingo*, 10 N. M. 38 [60 Pac. 73]; *Mennella* v. *Metropolitan St. Ry. Co.*, 43 Misc. Rep. 5 [86 N. Y. Supp. 930]; *Wise* v. *Short*, 181 N. C. 320 [107 S. E. 134], but that the power may be exercised to supplement existing statutes the provisions of which do not extend to all cases in which such a necessity appears (*State* v. *Howard*, 118 Mo. 127 [24 S. W. 41]; *Nioum* v. *Commonwealth*, 128 Ky. 685 [108 S. W. 945]). For example, statutes governing the appointment of interpreters do not usually provide for such officers in instances in which deaf-mutes are sworn as witnesses,

but the courts continually take the testimony of those thus afflicted by means of interpreters, and the' practice, when exercised in proper cases, is invariably upheld (*State* v. *De Wolf*, 8 Conn. 93 [20 Am. Dec. 90]; *Skaggs* v. *State*, 108 Ind. 53 [8 N. E. 695]; *State* v. *Howard, supra; Dobbins* v. *Little Rock R. & E. Co.*, 79 Ark. 85 [9 Ann. Cas. 84, 95 S. W. 794]; and we shall cite cases below justifying the use of interpreters where witnesses are in some other manner afflicted to such an extent that they are unable to convey their testimony directly to the jury. Therefore, the trial court did not err in the exercise of a general jurisdiction to appoint interpreters in the absence of a statute authorizing such appointment. Was the appointment proper under the peculiar facts of the case?

While one is engaged in the discharge of the duties of an interpreter he is but a witness (*People* v. *Lem Deo*, 132 Cal. 199 [64 Pac. 265]; *People* v. *Ong Git*, 23 Cal. App. 148 [137 Pac. 283]). Not only so, but he is a witness whose conduct must be subjected to the most careful scrutiny. It was said in *Rajnowski* v. *Detroit, B. C. & A. R. Co.*, 74 Mich. 15 [41 N. W. 849]: "In numerous contested cases, involving claims for damages from negligence, as well as in other cases, the testimony has been taken by means of interpreters. In very many instances the conflict of testimony is such as to indicate either more perjury than seems possible, or more likely incorrect renderings of testimony. Experience has shown in public as well as in legal business that great mischief has followed from incorrect interpretation. In several parts of our state the numbers are large of persons not familiar enough with our language to speak or comprehend what others say to them. This makes it necessary to employ the help of those who are supposed to understand both languages, and to be capable of transmitting correctly from each to the other all that is said by either person dealing with another. But the danger of mistakes in legal proceedings is such that nothing but practical necessity can justify the intervention of an interpreter between counsel and witness or witness and jury, although it is well settled that on a proper occasion it is allowable, and the occasion must usually be judged of by the trial court." While this language was applied, in strictness, to cases in which interpreters are employed for the purpose

of rendering one language into another, it is in some degree apposite to all instances in which such an instrumentality is interposed between witness, as that term is usually understood, and jury. It is evident that the right to show the general incompetency of an interpreter and to impeach the correctness of his rendition of testimony in particular cases is a right which should be jealously guarded. That such a right, founded justly upon the fact that an interpreter is a witness, has a virile existence is universally established by the authorities (*United States* v. *Gibert*, Fed. Cas. No. 15,204; *Schnier* v. *People*, 23 Ill. 17; *Skaggs* v. *State, supra; State* v. *Chyo Chiagk*, 92 Mo. 395 [4 S. W. 704]; *Sellers* v. *State*, 61 Tex. Cr. 140 [134 S. W. 348]; *State* v. *Cabodi*, 18 N. M. 513 [138 Pac. 262]; *State* v. *Deslovers*, 40 R. I. 89 [100 Atl. 64] *Claycomb* v. *State* (Okl. Cr.), 211 Pac. 429). It is said in the opinion in the second case in this list (*Schnier* v. *People*): "All persons are aware of the fact, that the power to make a literal translation from one language to another, so as to preserve in the translation the precise meaning of the original, depends upon an accurate knowledge of both languages by the translator. This being the office of an interpreter, if the person employed is not well versed in each language, he is liable to fail in giving the jury the facts, circumstances, conversations and admissions just as they were detailed by the witness, and if that is not done, the party against whom the mistake is made must suffer wrong, unless he shall be permitted to call others who are more capable of translating the language accurately. This, we think, is the right of the party. It cannot be the law that because an interpreter is called who is not capable of correctly translating the evidence, or from bias or partiality renders it incorrectly, that parties must be bound by it, although it may affect their most vital and important rights." In another of the cases, *United States* v. *Gibert*, the opinion shows the extreme extent to which the courts sometimes go in an endeavor to insure the correct performance of the duties of an interpreter. A point presented on the appeal was "that interpreters were admitted to interpret a part of the testimony of Perez without being previously sworn to interpret truly and faithfully." The portion of the opinion dealing with the question thus stated reads: "The facts were that Mr. Badlam was sworn as a general

interpreter of Spanish at the trial, and in an early stage of
his interpretation of some of the testimony, Mr. Child (one
of the counsel for the prisoners, and who himself understood
Spanish) objected to some of the interpretations as incor-
rect, and requested that two other gentlemen, whom he had
selected, might be sworn as interpreters. This was objected
to by the district attorney, who thought that it was his right
to use such an interpreter as he had confidence in, leaving
to the counsel for the prisoners to swear other interpreters
in their own employ in the 'cause. The court then, upon
the suggestion of the prisoners' counsel, allowed these two
interpreters to sit near Mr. Badlam and the witness, and
to suggest to Mr. Badlam any doubt or mistake in his in-
terpretation, for him to consider and rectify. This was ac-
cordingly done; and whenever any such suggestion was made
by these interpreters to Mr. Badlam (who did not profess
to be well acquainted with Spanish nautical terms), he
considered it, and I believe invariably adopted their inter-
pretation, and then stated it to the court as his own in-
terpretation. In a short time, however, it being perceived
that the interpretation of nautical terms became very im-
portant in the cause, upon the suggestion of the court both
of these interpreters were sworn, and one of them (Mr.
Peyton) was afterwards, during almost the whole of the
trial, used by the government as the exclusive interpreter.
Now it is not, and it was not at the trial pretended, that
ultimately any interpretation of the language of the wit-
nesses by Mr. Badlam went to the jury, which was incor-
rectly given, without due correction. There was no dis-
pute upon this head; and it could have been corrected in
a moment, if it had been suggested, for Mr. Peyton was
present throughout the whole trial. Under these circum-
stances the objection seems to me wholly groundless. Mr.
Badlam gave every interpretation to the court under oath; and
he had certainly a right to use the knowledge of others to
assist his own judgment in any case of doubt, giving his
own interpretation finally to the court."

The right secured to appellant under the rule laid down
in these cases, or left to be implied from them, was denied
her by the circumstances attending the employment of Mrs.
Graham as an interpreter of her husband's assumed answers
to the questions put to him. Before we conclude our dis-

cussion of the point, however, it is necessary to refer to a
few decisions which at first glance may seem to indicate
in some slight measure that the trial court did not commit
error in permitting the course taken in the endeavor to
convey the "testimony" of the witness to the jury. In
*Conner* v. *State,* 25 Ga. 515 [71 Am. Dec. 184], the defend-
ant in a criminal case asked a reversal of the judgment
against him because the trial court, over his objection, had
permitted a witness to give his testimony through an in-
terpreter, the witness "being unable to speak loud enough
to be heard by the jury, on account of temporary weakness
and debility, said testimony being communicated to the court
and jury" by the interpreter "after the witness had com-
municated it to him in a whisper." The higher court thus
disposed of the contention: "If the witness . . . was unable
from his physical condition to speak loud enough to be
heard by the court and jury, there can be no reason why
his answers should not be communicated by Col. Dudley,
an attorney of the court, in the presence and hearing of the
witness." A very little reflection will convince that the
situation disclosed by these excerpts from the opinion in the
cited case bears no material relation to the facts now before
us. There the witness could speak, for he whispered to
the interpreter, but his whisper would not carry to the jury.
Evidently any person near him could hear his whisper, as
the interpreter did, and doubtless the counsel of the defend-
ant approached near enough to hear him, as it was his right
and duty to do. Evidently, also, anyone in the courtroom
could see that the witness was whispering although the
whisper could not be heard. Here there was no evidence
of speech or whisper. Appellant's counsel stood by the
witness and could detect no sound, nor perceive an effort
to convey thought by articulation. If there was such an
effort no person in the courtroom could detect it except the
interpreter. It is apparent to us that the case cited is inap-
plicable here.

An interesting case, bearing somewhat upon the point now
under discussion, is *Skaggs* v. *State, supra.* There the ap-
pellant had been convicted of a criminal and lustful attack
upon a deaf-mute. After disposing of a certain question
under the law concerning interpreters the court said on
appeal, the Miss Coons referred to in the report having acted

as an interpreter: "But it appeared that a question, in relation to the offense charged, was propounded, through the interpreters, to the prosecuting witness, which shocked her innate modesty, and she fled precipitately from the presence of the court and jury into an adjoining room; that she was followed thither by Miss Coons, without any direction from the court, and without any objection on the part of the appellant; that, in the seclusion of that room, Miss Coons speedily succeeded in pacifying her, and in getting her answer to the shocking question, and, in about one minute, they returned together into the courtroom; and that there, in the presence of the court and jury, and of the witness and appellant, Miss Coons, without having repeated the question to the witness, communicated her answer thereto, obtained from her in such seclusion. . . . It is vigorously insisted on behalf of appellant that this proceeding was erroneous, intolerable in a court of justice, and a palpable violation of his constitutional right to be brought face to face with the witness testifying against him. In our opinion, however, the proceeding in question was not fairly open to any of the criticisms or objurgations of appellant's counsel. In some particulars the case is an anomalous one; for, to the credit of human nature, it is not often that a man is charged with an attempt, even, to gratify his passions upon the person of an unfortunate woman, forcibly and against her will, who is deprived of the sense of hearing and the power of speech. When the case occurs, however, as it must be sustained in the nature of things by the woman's evidence in relation to the offense charged, the proceedings to obtain her evidence will also be anomalous to some extent. If it be conceded that the proceedings of which appellant complains were irregular, or even erroneous, there is nothing in the record to show that the appellant was in any manner injured thereby. The record fails to show what the question was which shocked the modesty of the prosecuting witness, or what was her answer thereto which she communicated to Miss Coons out of the presence of the court and jury. In this state of the record, we cannot say that the error under consideration was material, or in anywise injurious to the appellant. Under our Criminal Code, we must disregard any error in the decision or action of the court below, which does not, in our opinion, prejudice

the substantial rights of the defendant. . . . In other words,. the record must show that the error complained of was material, and injurious to the defendant; otherwise the error must be disregarded here, and will not authorize the reversal of the judgment.'' While there is some language in this quotation which, when considered alone, conveys the impression that the view of the higher court was that the trial court did not err in permitting the interpreter to recite to the jury an answer of the witness given outside the court-room, the excerpt in its entirety will not bear that construction. To our minds the view of the court was that error was committed, not upon the considerations to which we now address ourselves, but upon another ground which we shall presently mention. Disposition of the point presented was really made upon the theory that the error was not shown to have been harmful.

Another case which we shall mention is *Renick* v. *Hays,* 201 Ky. 192 [256 S. W. 26], although, except as to the condition of the witness referred to in the opinion, it is of little similarity to the cause now before us. In the case cited the court said: ''The first insistence for reversal of the judgment is, that the court erred in appointing the daughter of the plaintiff as interpreter for him. Owing to an impediment in his speech, plaintiff could not make himself understood by strangers, and it is not claimed that it was error to appoint an interpreter for him, but the insistence is that the court should have appointed his brother or his wife instead of the daughter, who, as we are informed in brief for the defendant, is very attractive, and by her demeanor on the witness-stand gave the plaintiff an undue advantage. There is, however, nothing in the record to indicate that this is true. There was no objection during the trial to anything she did, and the only question presented by the record is, whether or not the court erred in appointing her rather than plaintiff's brother or wife. The court heard proof as to which of these three parties could best interpret plaintiff's speech, and it was shown without contradiction that the daughter could understand her father with less difficulty than either his brother or wife, and we conclude that in her appointment the court did not abuse a sound discretion.'' It will be observed that in this case there was no objection

to the appointment of an interpreter, as there was in the present instance, and that the sole point made was that the trial court abused its discretion in designating an attractive young woman to act in that capacity, instead of other persons who were present in the courtroom. The fact that the young woman was better qualified to perform the work in hand than were the others amply justified the court in appointing her, of course.

After an unusually diligent search for authority we have found none, aside from the three cases of which we have made use, which is similar upon the facts to the present, and we have been careful to present the three because of the novelty of the question with which we are confronted. On the whole, we are convinced that the trial court erred in permitting the use of Mrs. Graham as an "interpreter" for the reason that, by the very circumstances surrounding the condition of her husband, appellant was denied the right to impeach or to ascertain the correctness of the "interpretation" or "translation" rendered by her, even admitting that she heard or saw something which was susceptible of interpretation or translation.

There is another point which is closely akin to the one of which we have just made disposition, and at which we have hinted in some of the remarks we have already let fall. We believe there is a public policy which operates against the action of the trial court in permitting Mrs. Graham to act as an interpreter under the peculiar facts disclosed by the record. Not only was appellant denied the right to impeach her "interpretation," but she is immune from a successful prosecution for perjury in making it, and that an interpreter who willfully renders a false interpretation or translation is within the statute denouncing perjury admits of no doubt. (See *People* v. *Lem Deo, supra.*) If it be conceived that Mrs. Graham is tainted with guilt as a perjurer, it must be observed that she is to go unwhipped either of indictment or by verdict. If in her secret heart she knows she has committed the crime, the secret is hers alone. Section 1880 of the Code of Civil Procedure provides that parties to an action upon a claim against the estate of a deceased person may not be witnesses "as to any matter or fact occurring before the death of such deceased person."

This enactment is based upon the theory that the persons affected by it should not be witnesses because they may not be contradicted by the deceased persons with whom they have had relations even if they may be contradicted by never so many of the living. Mrs. Graham as a witness in the present case, and we have seen that she was nothing more, can be contradicted by neither the living nor the dead. For these reasons we think the trial court erred. We do not mean to say, of course, that every person must be excluded from the witness-stand if his testimony is not subject to dispute, but we do say that for that reason Mrs. Graham should not have been permitted to act as an interpreter under all the circumstances present here.

We think also that the action of the trial court in permitting Mrs. Graham so to act was erroneous upon the ground stated in *Skaggs* v. *State, supra.* In that case the interpreter gave to the jury an answer procured from the witness outside the courtroom. Here the situation disclosed by the record is no different from one in which the entire "testimony" of Graham might have been procured out of the presence of the jury and by Mrs. Graham conveyed to that body, without the witness ever having been seen by its members. Surely, therefore, it cannot be said that appellant was confronted by a witness against her in the person of Graham, a right to which she was entitled under section 686 of the Penal Code, and yet the jury was permitted to understand that Graham testified against her. Appellant's counsel very properly interposed the objection that the testimony apparently presented to the jury was not the testimony of Graham, for it could not be perceived that he gave testimony, but only the testimony of the interpreter.

[7] Several witnesses testified over the objection of appellant that she had treated them for physical ills and that they had not been benefited by her ministrations. This evidence was offered upon the issue as to the falsity of appellant's representations that she was a divine healer. It is now contended that the evidence was erroneously admitted. We think it was proper. We cannot conceive how the issue was to be proved except upon evidence that appellant could not heal, and it was surely proper to show that she could not heal by testimony that she had not healed particular

cases. It will not do to say that any person engaged in the work of healing, whether by the use of medicine or through the instrumentality of prayer, is not to be judged by his lack of success in individual cases. Certainly, if every patient he ever had were produced and it were shown that he had never effected a cure, a jury would be justified in finding that he could not heal and that his pretension that he could heal was a sham. The sufficiency of an amount or a degree of evidence short of that complete and wholesale array of it which would indisputably be satisfactory must be for the jury itself to determine, perhaps subject to review on appeal on the ground that the number of patients put on the stand, compared to the total number treated, was so slight that their testimony would not be a substantial amount of evidence upon the issue. It is apparent to us that the testimony of each particular witness concerning his individual case was a step toward the proof of the issue at least.

[8] Appellant contends that the trial court erred in instructing the jury that "it is not necessary, in order to establish the falsity of the representation, that the proof should be direct, but such evidence must be given, or such facts established, as tend logically and necessarily to prove them." The vice which is claimed to inhere in this instruction lies in the assertion that the evidence to prove the falsity of a representation need not be direct. Appellant says that the instruction was erroneous because of the provisions of section 1110 of the Penal Code, which is to the effect in part that in such a case as the present "the defendant cannot be convicted if the false pretense was expressed in language unaccompanied by a false token or writing," which was the case in the present instance, "unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances." The only point to be determined upon the question now presented is whether the requirement of section 1110 goes to the fact of the falsity of a representation, or merely to the question whether the representation was made. It is contended that this question is to be resolved upon an analogy furnished by section 1968 of the Code of Civil Procedure, which provides that perjury must be proved "by the testimony of two witnesses, or one witness and corroborating circumstances," but in our opinion

the analogy is lacking. It is true that it is settled that section 1968 contemplates proof as to the falsity of the testimony which is the basis of a charge of perjury and not as to the giving of the testimony (*People* v. *Wells,* 103 Cal. 631 [37 Pac. 529] ; *People* v. *Maxwell,* 118 Cal. 50 [50 Pac. 18] ; *People* v. *Smith,* 3 Cal. App. 68 [84 Pac. 452]), but the language of the section is very different from the language of section 1110 of the Penal Code. Section 1968 provides in terms how *perjury* shall be proved while section 1110 makes express provision for the proof of the *pretense* involved in a charge of obtaining money or property by false pretenses. Moreover, the latter section makes provision for the proof of oral pretenses, and not of those evidenced by a token or writing, thus drawing two kinds of pretense in direct contrast and leaving it to be understood that in the case of one evidenced by token or writing the token or writing is sufficient proof of the pretense, while it is expressly provided that an oral pretense must be proved by two witnesses or by one and corroborating circumstances. It has been decided in a case in another jurisdiction (*State* v. *Van Ruschen,* 38 S. D. 187 [160 N. W. 811], under a statute practically identical with section 1110 of our Penal Code, that it "is as to this one element of the crime, the pretense, that the statute requires corroboration." This language, it will be observed, excludes the idea that the section can apply to evidence of the *falsity* of the pretense. There are several California cases (*People* v. *Martin,* 102 Cal. 558 [36 Pac. 952] ; *People* v. *Smith,* 3 Cal. App. 62 [84 Pac. 449], but not the same case as one of a like title cited above as at page 68 of the same volume; *People* v. *Wymer,* 53 Cal. App. 204 [199 Pac. 815] ; *People* v. *Whiteside,* 58 Cal. App. 33 [208 Pac. 132]), which, while they do not exclude the view that section 1110 may apply to the falsity of the pretense, decide directly that it does apply to the pretense itself. We are satisfied, on the whole, that the construction placed upon the similar statute in *State* v. *Van Ruschen, supra,* is the correct one and that the element of falsity of representations under a charge such as the one now before us may be proved under the general rules of evidence applying in criminal cases. That rule was properly stated in the questioned instruction.

[9] The jury was instructed: "If testimony in regard to other representations has been introduced here, they cannot be considered in establishing the guilt of the defendant by themselves, but may only be considered as showing the intent of the defendant in regard to allegations or the statement of misrepresentations alleged to have been made in the information." It is insisted that the latter part of this instruction was erroneous for the reason that it is the law that in a prosecution for one offense, evidence of other offenses should be excluded. There are many exceptions to this rule, but we need not decide whether the rule itself applies in instances like the present, or whether the case is within one of the exceptions to it. Appellant does not show us that there is evidence of other offenses in the record. If, therefore, the instruction was erroneous, we are not shown that the error was harmful.

Appellant requested that the following instruction be given: "To constitute the offense charged four things must concur and four distinct averments must be proved: 1. There must be an intent to defraud; 2. There must be actual fraud committed; 3. False pretenses must be used for the purposes of perpetrating the fraud; and 4. The fraud must be accomplished by means of false pretenses made use of for the purpose, namely: They must be the cause which induced the owner to part with his property." The instruction was refused and it is contended that the refusal was error. Counsel for respondent do not say that the substance of the proposed instruction was given to the jury in some other instruction. In fact, they make no reply whatever to appellant's contentions as to the giving or refusing of any instructions except to say that the "particular instructions objected to by appellant all bear upon the issues involved and were not prejudicial to the substantial rights of the defendant." We have perused the instructions given, however, and find among them practically the exact language of the instruction offered by the appellant and refused. To have given it would have been but a useless repetition.

[10] In view of the provisions of section 4½ of article VI of the constitution we have examined the entire cause, including the evidence, for the purpose of ascertaining whether the errors of the trial court have resulted in a

69 Cal. App.—32

miscarriage of justice, that course on our part being neces-
sary under the language of the section. The first subject
of inquiry after this perusal of the record is as to the con-
dition of the evidence upon the question of the making of
the representations charged in the information. There is
ample testimony to support a finding that appellant repre-
sented that she was a divine healer. The evidence is pos-
sibly sufficient to sustain the charge that it was represented
by appellant that she had enough patients to more than fill
an eleven-room sanitarium. There is evidence that appellant
said she was seeking to rent a new place in which to con-
duct her business. There is no evidence to support the
charge that she represented that she had patients who had
agreed to pay her, respectively, $1,500 and $2,000 for treat-
ments. On this head Mrs. Elgin testified that appellant said
she had patients who "were going" to pay her these sums
and that she "was going to get" the amounts from them.
She further testified that appellant never said that she had
agreements with these patients, but that after the Elgins had
parted with their money to appellant the latter said that
she usually took from her patients agreements to pay for
treatments. Elgin testified that he had no recollection that
appellant ever said she had agreements with the two patients,
but that she did say that she had two patients who "would
pay" her the amounts mentioned in the information. The
evidence will not support the charge that appellant repre-
sented that she had sufficient patients and business to bring
in an income of $1,000 per month. Mrs. Elgin's testimony
under this charge was that appellant represented that she
had "made thousands and thousands of dollars in New York"
and that "we can do it right here in San Diego"; that "we
would have a good return" and "would get good returns
from our money"; that "I will not have this money [of
the Elgins] a month until you will be getting $1,000.00 in
return, $500.00 apiece"; and that, finally, appellant "never
mentioned" what she had made in San Diego and that the
witness had never asked her for that information. Elgin
testified on this head only that appellant had stated that she
"was positive" the business "would make them [the El-
gins]" from $500 to $1,000 per month if the partnership
arrangement then contemplated were entered into and a new

place of business which they hoped to locate was properly equipped for the work. It will be observed that this testimony departs from the allegation of fact contained in the information and reduces appellant's statements to matters of mere opinion and hope.

We take up now the contents of the record bearing upon the falsity of the representations shown to have been made by appellant. There is no evidence that the representation that she was seeking a new sanitarium was untrue. On the contrary, such evidence as is disclosed by the record tends to show that the representation was true. The evidence shows that, immediately after the partnership arrangement was concluded between appellant and the Elgins, the three began a search for a new place of business and finally located one and rented it. Upon these considerations there are left but two charges of misrepresentation upon which the jury properly could have rendered a verdict of guilty, the one that appellant was a divine healer and the one that she had more than enough patients to fill an eleven-room sanitarium. The only evidence bearing upon the first of these was the erroneously admitted testimony that appellant's daughter sometimes took her mother's place as a "healer"; testimony that appellant had not healed Graham, for that was the purport of the testimony of that "witness" and of his wife, who corroborated him; that she had not healed a Mrs. Smith; and from a nonexpert witness other than the Elgins testimony that appellant had not healed those persons, for they were still "not well." We need not specify the evidence touching the representation concerning the eleven-room sanitarium, as the errors of the court affected not that issue, except to say that it was sufficient to support a finding that the representation was false.

We must say under this record that "we are unable to determine whether appellant would or would not have been convicted but for the errors of the court. . . . Under such circumstances the provisions of section 4½ may not be availed of to support the judgment of conviction" (*People* v. *Irby*, 67 Cal. App. 520 [227 Pac. 920]). The testimony to the effect that appellant's fourteen year old daughter was allowed by her to treat patients must have been damaging to appellant's cause, especially as the district attorney said

in the presence of the jury: ''It is one of the circumstances that was most convincing to me, and I believe it would be convincing to the jury.'' The ''testimony'' of the ''witness'' Graham was to the effect that he had gone to appellant for relief from the terrible affliction which was exhibited to the jury by his presence before that body and that he had not been healed. The error of the court in permitting the course which was adopted for the purpose of interpreting his alleged testimony to the jury, backed as it was by his pathetic appearance, must have been particularly harmful to appellant's rights. The fact that his wife gave, as a witness proper, if we may use that expression, substantially the same testimony which she gave as an interpreter, did not in our opinion lessen the harm done. Who can say how many jurors were caused to vote for a conviction upon the charge that appellant had falsely represented herself to be a divine healer under the influence of the testimony concerning her daughter and of the appearance of Graham, or whether the entire jury was influenced to render a verdict of guilty upon that charge under the same influence? Who can say how many of the jurors voted for a conviction upon one of the two charges upon which appellant might possibly have been properly convicted and how many upon the other, there being errors of the trial court which bore upon one of them and none which bore upon the other? This latter question is a pertinent one under a case which, under different circumstances, announces a rule which is yet applicable here. There both proper and improper issues were submitted to the jury by the trial court. The appellate court said: ''As . . . it cannot be told upon which issue the verdict was based or as to what degree they both figure in the finding, the verdict cannot be permitted to stand'' (*Markart* v. *Zeimer*, 67 Cal. App. 363 [227 Pac. 683]). An earlier case, decided, it is true, upon a different state of facts, lays down what is on principle the same rule (*People* v. *Elgar*, 36 Cal. App. 114 [171 Pac. 697]).

In considering the question whether the errors of the court have resulted in a miscarriage of justice we cannot close our eyes to the fact that the mere making of such a charge as that upon which appellant was tried will predispose a jury unconsciously against the defendant charged, notwithstand-

ing the oath to give a fair trial, and that circumstances even slighter than those shown in the errors of the trial court in the present instance may turn the scale against the accused under such a charge. Appellant may have been in fact one of the fake clairvoyants, magnetic healers, and divine healers with which the world is crowded, or she may not have been. We are not satisfied, at any rate, that her delinquencies in that regard, if any she had, were exposed under the forms of law in the present case.

Appellant presents various claims of error which we have not considered, but we have disposed of all questions raised by her which are necessary to a disposition of the appeal, or to a determination of points which may possibly arise upon a second trial.

Judgment and order reversed.

Finlayson, P. J., and Craig, J., concurred.