[Crim. No. 1280.   Second Appellate District, Division Two.—January 7, 1926.]

## THE PEOPLE, Respondent, v. VOUDRIA C. HOLTZCLAW et al., Appellants.

[1] INTERPRETERS—COURTS—JURISDICTION.—In every court there rests the inherent power to call interpreters for witnesses under proper circumstances; and it is the duty of a court to call an interpreter whenever such circumstances arise.

[2] CRIMINAL LAW—ROBBERY—DEMAND FOR INTERPRETER—SUFFICIENCY OF.—In this prosecution for robbery, the defendants presented in the trial court in sufficient form a demand for an interpreter to interpret for the complaining witness.

[3] ID.—INTERPRETER—DISCRETION.—The question whether an interpreter shall be called for the purpose of rendering testimony of a witness who does not understand the English language rests in the discretion of the trial court.

[4] ID.—REFUSAL TO CALL INTERPRETER—DISCRETION—EVIDENCE.—In this prosecution for robbery the trial court did not abuse its discretion in refusing to call an interpreter to interpret for the complaining witness.

[5] ID.—UNDERSTANDING OF LANGUAGE — HOW DETERMINED.—In such prosecution, the question as to the complaining witness' understanding of the language is to be solved upon examination of his entire testimony, and not merely that part of it which had been developed when the request for an interpreter was made.

[6] ID.—VERDICT—EVIDENCE.—In such prosecution, the evidence was sufficient to support the verdict of guilty.

(1) 15 C. J., p. 871, n. 86, 87; 16 C. J., p. 808, n. 42.   (2) 15 C. J., p. 871, n. 87.   (3) 15 C. J., p. 871, n. 87; 16 C. J., p. 808, n. 43; 40 Cyc., p. 2413, n. 17.   (4) 15 C. J., p. 871, n. 87.   (5) 15 C. J., p. 871, n. 87.   (6) 34 Cyc., p. 1808, n. 78.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Charles S. Crail, Judge.   Affirmed.

The facts are stated in the opinion of the court.

C. B. Conlin and E. R. Simon for Appellant Davis.

1.   See 27 Cal. Jur. 69.
3.   See 8 Cal. Jur. 226; 26 R. C. L. 1015.

George E. Stoddard for Appellant Holtzclaw.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

WORKS, J.—Defendants were convicted of the crime of robbery. They appeal from the judgment of conviction and from an order of the trial court denying their motion for a new trial.

The prosecuting witness, and the sole witness as to the actual facts surrounding the robbery, was one Frank Ito, a Japanese. Over the objection of appellants the trial court required the examination of Ito by means of the English language, and not through an interpreter. It is contended that in this ruling the court abused its discretion. In order to make disposition of the point it will be necessary to quote somewhat voluminously from the record. After the oath had been administered to the witness and after a single question had been propounded to him on direct examination, one of the counsel for appellants asked and obtained leave to examine him in order to ascertain "if he understands what has taken place in the administration of this oath." The record then shows: "Q. Do you know what the Clerk in this Court just did to you? A. Yes. Q. What did he do? A. Today? Q. Yes, today. A. We have court today. Q. You understand thoroughly, of course, what the Clerk just administered to you? A. No, I don't know." At this point appellants objected "to this witness testifying." Thereupon the district attorney examined him thus: "Do you know what it means to take an oath? Do you understand what it means to take an oath that you just took, to hold up your hand and swear you will tell the truth? A. Yes, the date, the 30th of March. . . . [Q.] Do you know what it means to take an oath, to hold up your hand and swear you will tell the truth? A. Yes, the whole truth. Mr. Conlin: It has already been answered, your Honor. The 30th of March is his answer. The Court: This matter goes to the credibility of the witness; it should not go to exclude the testimony of the witness. . . . Mr. Murray [a Deputy District Attorney]: We might need an interpreter in this case. The Court: All right; proceed. Mr. Murray: Do you know, Mr. Ito, that you are to tell

the truth? A. To tell the truth. Q. Do you know it is a crime of perjury not to tell the truth? A. Yes, I tell the truth. Q. Do you know it is a crime not to tell the truth when you swear to God you will tell the truth? A. Sure, I will tell the truth. Q. Do you know that they will put you in jail if you don't tell the truth? A. I told all the truth. Q. But do you know that if you don't tell the truth they will put you in jail? A. Yes. Q. You know when you put your right hand up and swore you would tell the truth— A. Yes, I swore I would tell the truth. Q. Do you know what it means to hold your right hand up and swear you will tell the truth; do you know that is an oath? A. Yes, truth; I know. Q. Do you understand what I say to you all the time? A. Sometimes I can't understand very good English. Q. Would you like to have an interpreter? A. I have an interpreter next door to my place. He talks pretty good English. Q. I know, but would you like to have an interpreter here in court today to interpret your language into English, Japanese into English and English into Japanese? A. Yes, I think interpreter is best. Q. Do you understand everything that counsel and myself have been saying here? A. No, I don't know. This is the first time I am in court. I don't know much. Mr. Murray: I think maybe, your Honor, it would be better to have an interpreter, although the witness speaks fairly good English. Mr. Conlin: Do you believe in a supreme being? A. Supreme man? Q. Do you believe in a supreme being? A. Do you mean a high court? Q. Yes, that is right. Mr. Murray: I submit that the witness doesn't understand what he is talking about. The Court: All right. Call an interpreter. Mr. Conlin: I will submit he don't, too. The Court: The Clerk advises me that it will take some time to get an interpreter, possibly until 2 o'clock. Now, regarding the objection to this witness testifying, Section 1879 of the Code of Civil Procedure provides that 'all persons, without exception, otherwise than as specified in the next two sections, who, having organs of sense can perceive, and, perceiving, can make known their perceptions to others, may be witnesses. Therefore, neither parties nor other persons who have an interest in the event of an action or proceeding are excluded; nor those who have been convicted of crime; nor persons on account of their opinions on

matters of religious belief.' The sections which contain the exceptions are those referring to persons of unsound mind and children under ten years of age, and so forth. Mr. Conlin: The first section the Court read is the one I based my objection upon, those that apparently do not perceive and cannot make known their perception. The Court: The belief in a supreme being is not essential. Mr. Conlin: No, but the principal objection was that he did not perceive what was going on and could not make known his perception. The Court: However, those are matters which the jurors may take into consideration in weighing the evidence, and for that reason the Court will let you proceed. Now, as to whether this man has organs of sense, it is apparent he has. Whether, perceiving, he can make known what his organs of sense disclose to him, the result of his perception, is a matter which we can determine after more careful investigation, after a little further proceeding. I am informed that this witness got ahead in the preliminary examination without an interpreter, and so I am willing to make an effort to proceed. If it appears later that it will be necessary to have an interpreter, why, we shall get one at 2 o'clock. You may proceed." The examination of the witness upon the merits of the cause was then taken up and concluded.

It will be observed from the portion of the record which is above set forth that there was a strange intermixture of legal questions involved in the discussion between the trial judge and counsel for appellants. Three separate points were by them entangled together. These were: First, was Ito competent as a witness under the terms of section 1879 of the Code of Civil Procedure? Second, did he comprehend the nature of the oath which the clerk administered to him? Third, did he understand and speak the English language? This last question is important under the provisions of section 1884 of the Code of Civil Procedure, which reads, in part: "When a witness does not understand and speak the English language, an interpreter must be sworn to interpret for him." [1] In every court there also rests the inherent power to call interpreters for witnesses under proper circumstances (*People* v. *Walker,* 69 Cal. App. 475 [231 Pac. 572]); and it is, of course, the duty of a court to call an interpreter whenever such circumstances arise.

[2] We advert to the state of the record concerning the three questions discussed by the court and counsel for appellants because there is some doubt whether appellants actually presented to the court the third question, the one upon which they now rely, although we have stated at the outset of this opinion that they did. We propose now to resolve that doubt. There is nothing in the record which lays a foundation for either of the two questions which we have first stated. There was not the slightest ground for the view that Ito was not competent as a witness under the provisions of section 1879 of the code. There was nothing to indicate to the court that he was not in the full possession of his faculties. Likewise, there was nothing to show that he could not comprehend the nature of an oath, if it had been administered to him in his native tongue. His entire difficulty, plainly, was with the English language. Although three questions were intermingled in the discussion between the court and counsel for appellants, there is a fairly clear indication in the somewhat confused record that it finally appeared to all concerned that the only real point before the court was as to the necessity for an interpreter, the point embraced in the third question stated by us. The deputy district attorney evidently saw clearly that the calling of an interpreter would remove whatever difficulty was created by the peculiar answers to some of the questions put to Ito in English. It is true that the first objection of appellants' counsel was "to this witness testifying," but close upon the objection the deputy district attorney remarked: "We might need an interpreter in this case." Then, a little later, came this portion of the record: "Q. Do you understand what I say to you all the time? A. Sometimes I can't understand very good English. Q. Would you like to have an interpreter? A. I have an interpreter next door to my place. He talks pretty good English. Q. I know, but would you like to have an interpreter here in court today . . . ? A. Yes, I think an interpreter is best. . . . Mr. Murray: I think maybe . . . it would be better to have an interpreter . . . " Following this, and after the court's mention of section 1879, Mr. Conlin said: "The first section the Court read,"—doubtless he meant the first sentence—"is the one I based my objection upon, those that apparently do not perceive and cannot make known their perception, . . .

The principal objection was that he did not perceive what was going on and could not make known his perception." A few lines further on the court said: "I am informed"—by what means does not appear—"that this witness got ahead in the preliminary examination without an interpreter, and so I am willing to make an effort to proceed." Under all these circumstances we determine that appellants presented in sufficient form a demand for an interpreter and had an adverse ruling upon it.

[3] The question whether an interpreter shall be called for the purpose of rendering the testimony of a witness who does not understand the English language rests in the discretion of the trial court (*People* v. *Morine*, 138 Cal. 626 [72 Pac. 166]). [4] Was the discretion abused in the present instance? An answer to the question requires a further quotation from the record of Ito's testimony. We set forth his story of the commission of the crime with which appellants were charged, as it appears in his direct examination, omitting introductory matters and much testimony which bears but indirectly upon the main question. Ito was a restaurant-keeper. He testified: "Q. . . . Did you see either of these defendants on [the morning that the crime was committed]? A. Those two fellows I saw. One little short fellow has got a pistol. Q. Did you see the other defendant, too? . . . A. I know the short fellow. Q. Davis? A. He had the pistol. Q. How long have you known him? A. Oh, he came to my place last June or July, last year. Q. June or July last year? A. Yes; once in a while, not all the time. Q. How many times has he been in your place altogether since you have owned that place down there? A. Oh, about three or four times, I know. Q. You just knew him as a customer that came into your place three or four times? A. Three or four times; I can't say how many for sure, but I know three or four times. Q. The other defendant Holtzclaw, did you ever see him before? A. I never saw him before. Q. The first time you ever saw him was on the morning of the 30th (the day the crime was committed)? A. Yes. Q. What time in the morning did you see them? A. A little after 4:30. Q. 4:30 A. M.? A. In the morning. Q. What time do you open up that restaurant down there? A. I open at 4:30. Q. How long had you been open when you saw these two defendants? A. I can't

catch it quite. Q. How long had your restaurant been open when you saw these defendants? A. Just opened. . . . Q. Was it dark outside? A. Yes. Q. How many lights have you in your restaurant? A. Two in the front, two in the kitchen and one in the room. Q. One where? A. Two on the lunch counter in the front, and two in the kitchen, but we haven't got no partition between the kitchen and the counter. Q. Are the kitchen and the counter all in one room? A. We have a serving table between the counter and kitchen. . . . Q. Just relate what occurred down there on the morning of the 30th when you saw these two defendants. A. The morning of the 30th— Q. Talk slow and talk loud so the lady in the rear back there can understand you and hear you. A. March 30th, in the morning, 4:30, two fellows came in and ordered ham and eggs. At that time I was in the kitchen, and two fellows just came in, and I asked, 'What you going to have?' Q. Who did you ask that of? A. This fellow first. Q. Davis? A. Yes. Q. What did he say when you asked him what he was going to have? A. He said ham and eggs, and the big fellow was on the second stool. Q. That is, Holtzclaw? A. On the other side (indicating). . . . Q. Was anybody else there present besides you and the two defendants? A. The two and me. Q. That is all? A. That is all in there. And the little fellow on this side. Q. Which fellow, Davis? A. Yes. Q. Call them by names. A. I don't know them by names. Q. The little fellow is named Davis, and the other fellow is named Holtzclaw. A. He asked me, 'I want a chance to wash hands,' and I go into the kitchen and he come behind me to wash his hands. We got water in the kitchen; we don't have any washstand in the front. Q. You have no place to wash hands in the front? A. No; in the kitchen. Q. Do you have a place in the kitchen where you can wash hands? A. Yes, and he came behind me, and the big fellow goes behind the counter. We got a register by the wall at the counter, and he pushed the register. Q. What did he do? A. He pushed the cash register. Q. Pushed in on the cash register? A. Yes. Q. Where were you at that time? A. I was by the stove in the kitchen. Q. Where was Davis? A. Davis was beside the stove. Q. How far from you? A. Two or three feet. Q. Then what happened? A. He pushed the register; I heard the bell ring,

the noise. Q. You heard the bell ring? A. And I said, 'Here! Here! What you doing?' and Davis say, 'Keep quiet or I shoot you.' And put the pistol across me. Q. What did you see then? A. I said, 'What you doing?' He say, 'Keep quiet; keep quiet,' and he put the pistol on me and said, 'Lay down; lay down.' Q. Who said that? A. The little fellow, Davis, and 'head down.' Q. 'Head down'? A. Yes. Q. What did you do? A. I cannot do much; I got no chance to do anything. Q. Did you lay down or did you stand up? A. Yes, I just lay down like this. Q. Then what happened? A. They got out. We got no partition. I can see through to the register. Q. You can what? A. I could see clear through to the register at the front, and I saw him take out the money, and we have several cartons of Chesterfields and Camel cigarettes. Q. How much money did you have in the cash register, do you know? A. $6.15. Q. All right. A. And he cleaned up the cigarettes and the money and he came in the kitchen. Q. Who came in? A. That big fellow. Q. What did he do? A. He came in the kitchen. Q. All right. Whereabouts were you on the floor with reference to the stove; were you close to the stove? A. Yes; I never moved. Q. You never moved? A. Because he has got a pistol; I can't move. Q. Then what? A. And the little fellow says, 'Come on.' Q. Who said that? A. The little fellow. Q. What did he say? A. He took me to the back room. Q. Did he still have the pistol in his hand? A. Yes. Q. Which way did he have it pointed, the pistol? A. The pistol in his right hand. Q. Which direction was he pointing it at? A. Mr. Davis. Q. Which way did he have the pistol pointed? A. Right on my nose. Q. What did he say? A. He said, 'Come on; get up,' and I sat up, and he asked the big fellow, 'How much money have you got?' The big fellow said, 'About $5,' and the little fellow said, 'Oh, you got more than $5. All Japanese have more money.' Q. Who did he say that to, you? A. Yes, to me he said, 'You got more than $5,' and the little fellow said, 'You got more than $5; all Japanese keep more than $5 in their room. Where is your money?' and I say, 'I ain't got any,' and he looked in my pants, and I got a back pocket, a Mexican money half-dollar. Q. Half a dollar in Mexican money in your back pocket? A. Yes, sir; I had it for two months.

And he said, 'Come on in the room.' Q. Which room was he referring to? A. In the back room. . . . Q. Where did you go? A. Go in the room and take up the mattress, take off the bedding and the mattress. I have got a little box under the bed that I put junk stuff in there. Q. Put what? A. Junk stuff. Q. Oh, junk stuff in the box. I see. A. And he turned the box over and the bedding. Q. What? A. Took off the bedding and say, 'Where is the money?' Q. Who said that? A. The little fellow. Q. Did he still have the gun in his hand? A. Yes. . . . Q. Where was your wife? A. My wife, when I said, 'Hey! Hey!' she heard it. . . . I hollered when he pushed the cash-register; I hollered, 'Here! Here! What are you doing?' . . . Q. Did you hear anything out in the living-room when you yelled 'Here! Here!'? A. Yes. Q. What did you hear? A. I know my wife went out. Q. How do you know that? A. We got a spring-door. Q. Did you hear that spring-door? A. The screen door I heard. Q. When you went out there with those two fellows, was your wife in the living-room? A. No; she had gone out the back. Q. She had already gone? A. She had already gone when we came into the room. . . . The little fellow . . . said, 'Where is your wife?' I said, 'My wife no stay here.' I said, 'My wife no stay here.' He said, 'Yes, she stay here. Maybe she went down to get a cop.' I said, 'No.' I said, 'No, she no sleep here.' Q. You told him, 'she no sleep here'? A. And he said, 'Oh, yes; maybe she go get a cop,' and they started to go out. Q. Who said that? A. The little fellow said, 'I don't want ham and eggs today.' Q. Said he didn't want ham and eggs? A. He said he didn't want ham and eggs, and I should stand there three minutes and not move, and they went out like this through the door. Q. With the pistol pointed at you? A. Yes; and as soon as he got out the door, they go around to the east.''

We recite this testimony for the purpose of showing that the prosecuting witness had such a comprehension of the English language that the trial court was justified in denying the request that an interpreter be called to aid in the rendition of his testimony. [5] We have no doubt that the question as to his understanding of the language is to be solved upon an examination of his entire testimony, and not merely that part of it which had been developed when

the request was made. There were some matters in the cross-examination of the witness which aid in a slight degree the contention now made by appellants, but they are unconvincing when placed beside the rather graphic story of the crime as related on the direct examination. Moreover, the discrepancies and inaccuracies shown in the cross-examination are largely explainable upon grounds other than the lack of understanding of the English language on Ito's part. The court did not abuse its discretion in refusing to call an interpreter.

[6] We have not scrupled to quote somewhat extensively from the direct examination of the prosecuting witness—apparently, indeed, a necessary course in meeting the point involved in the failure of the trial court to call an interpreter—for the added reason that it bears upon another point made by appellants. It is insisted "that the verdict was contrary to the law and the evidence" in that the testimony of the prosecuting witness, standing alone, as it did, upon the main features of the case, was so confused and uncertain as to amount to nothing. We understand the contention to mean that, for the reasons stated, the evidence failed to support the verdict. This point falls to the ground upon a mere perusal of the portion of the direct examination of Ito which is above set forth.

Judgment and order affirmed.

Finlayson, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 3, 1926.